[PUBLISH]

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

Nos. 16-12647, 17-10143, 17-10144, 17-10148 through 17-10154,
17-10193 through 17-10196, 17-10198, 17-10199, 17-10200,
17-10202, 17-10203, 17-10205 through 17-10209,
17-10212 through 17-10214, 17-10216 through 17-10218

_____

D.C. Docket No. 6:14-cv-01544-ACC-GJK, et al.

A.L. by and through D.L., as Next Friend, Parent and Natural Guardian,
S.J.K, by and through S.L.K. as Next Friend, Parent and
Court-Appointed Guardian,
et al.,

Plaintiffs-Appellants,

versus

WALT DISNEY PARKS AND RESORTS US, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 17, 2018)

Before NEWSOM and HULL, Circuit Judges, and ROYAL,[*] Judge.

HULL, Circuit Judge:

This is a consolidated appeal of 30 separate lawsuits.  Most plaintiffs-appellants are individuals with severe autism.  Defendant-appellee is Walt Disney Parks and Resorts US, Inc. ("Disney"), a division of The Walt Disney Company.

In separate lawsuits, plaintiffs filed claims alleging that Disney, at six of its theme parks, fails to accommodate their disabilities, in violation of Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12182.  Plaintiffs allege that their severe disabilities include an inability to comprehend the concept of time, defer gratification, and wait for rides, as well as strict adherence to a pre-set routine of rides in a specific order.  Plaintiffs therefore contend that access to all of Disney's rides must be both nearly immediate and in each plaintiff's individual, pre-set order to accommodate fully their impairments.

Disney responds that it accommodates plaintiffs' disabilities because its current Disability Access Service ("DAS") program allows cognitively disabled guests like the plaintiffs (1) to enter immediately all rides with waits of less than 15 minutes, which is most rides, (2) to schedule appointment times for rides with longer waits, and (3) to never have to stand in a physical line for any ride.  In each case, the district court granted Disney summary judgment and concluded that the

---

[*]Honorable C. Ashley Royal, Judge for the United States District Court for the Middle District of Georgia, sitting by designation.

2

DAS program already accommodates plaintiffs' disabilities and that revising the DAS program is not necessary for plaintiffs to have equal access and enjoyment of Disney's parks.  Our opinion is organized as follows.

## CONTENTS

I. DISNEY THEME PARKS ...........................................................................4

    A. General Background .......................................................... 4

    B. FastPass System ................................................................ 6

    C. Re-admission Passes ......................................................... 8

    D. Disability Access Service Program (DAS) ...................... 9

    E. Individualized Accommodations ..................................... 13

    F. Advance Planning ............................................................ 14

II. AUTISM AS A DISABILITY .................................................................15

III. PLAINTIFFS' EVIDENCE ....................................................................20

    A. Testimony of Plaintiffs' Parents ..................................... 20

    B. Day-in-the-Park Narratives for Plaintiffs A.L., A.B., S.M., and J.M. .... 25

    C. Expert Dr. Joette James ................................................... 28

    D. Scientific Studies ............................................................ 30

IV. DISNEY'S EVIDENCE ..........................................................................32

    A. Expert Dr. Jill Kelderman ............................................... 33

    B. Expert Dr. Jack Spector .................................................. 35

V. PROCEDURAL HISTORY .....................................................................36

VI. STANDARD OF REVIEW ......................................................................39

VII. DISCUSSION ..........................................................................................40

    A. Title III of the ADA ........................................................ 40

    B. Definition of Disability ................................................... 41

    C. Blanket Policy ................................................................. 42

    D. Claims Based on § 12182(b)(2)(A)(ii) ........................... 46

E.  Necessary Modifications ........................................................... 48

F.  Analysis of "Necessary" .......................................................... 54

G.  Reasonableness and Fundamental Alteration ......................................... 59

H.  Intentional Discrimination Cause of Action .......................................... 62

VIII.  CONCLUSION ......................................................................... 65

## I.    DISNEY THEME PARKS

To evaluate plaintiffs' claims that Disney's DAS program does not adequately accommodate their disabilities, we discuss Disney's parks, its pass system for accessing rides, and how the DAS program works in that context.

## A.    General Background

Disney's six theme parks at issue include Disneyland and Disney California Adventure, both located in California; and the Magic Kingdom, Epcot, Disney's Hollywood Studios, and Disney's Animal Kingdom, which are all part of the Walt Disney World Resort in Florida.

These parks are popular vacation destinations.   In 2017, the Magic Kingdom in Florida received over 20 million guests.  This works out to an average of almost 55,000 visitors per day, every day of the year.  The same year, Disney California Adventure, the least visited of Disney's parks in the United States, received over 9.5 million visitors or around 26,000 per day.[1]

---

[1]See Themed Entm't Ass'n, Theme Index and Museum Index 2017: Global Attractions Attendance Report 10 (2018).

Each theme park contains rides and other types of attractions.  For simplicity, we use the term "ride" to refer collectively to the rides and attractions that may require waiting in line before boarding.  Disneyland has 46 rides; the Magic Kingdom has 40; Animal Kingdom has 39; Epcot has 29; California Adventure has 24; and Hollywood Studios has 11.  The numbers of rides vary over time so these are approximate numbers.  The density of the rides varies between theme parks because the parks vary greatly in geographic area.[2]

The parks offer activities with no lines or short lines, including parades, shows, concerts, characters, stores, and restaurants.  Many rides also have no wait times.  A guest can walk up and get on many rides within 5 to 10 minutes.  Some popular rides, however, have wait times from 10 to 30 minutes.  The newest or most popular rides may involve wait times ranging from 30 to 90 minutes or more.

To reduce wait times, Disney introduced a mobile app, called "My Disney Experience."  The app contains a map of the park and shows the location of each ride by name.  Using the map, a guest can see what rides are available and the location of each ride in relation to the guest's current location.  The map shows in "real time" the wait time, if any, for every ride.

---

[2]Disney's Animal Kingdom, the largest park, spreads across 580 acres; Epcot covers 300 acres; Disney's Hollywood Studios occupies 135 acres; the Magic Kingdom takes up 107 acres; Disneyland packs its attractions into 85 acres; and Disney California Adventure, the smallest park, is 72 acres.  Even at the smaller parks with the highest density of rides, guests can expect to walk several miles per day getting around the park.  Disney has a robust program for guests with mobility issues, including motorized vehicles.

Wait times for rides depend on a number of factors, including: the popularity of the ride; the day of the week; the time of day; the time of year; the weather conditions; whether the ride is running at less than full capacity; whether a nearby ride experienced an unexpected shutdown; and whether a nearby parade ended recently. When guests wait for rides, they do so in one of two lines: (1) the Stand-By line; or (2) the FastPass line.

The Stand-By line operates this way. A guest joins the line at the end and moves up to the front as the people ahead board the ride. If a ride has a 60-minute wait, the guest waits physically in the Stand-By line for 60 minutes. Anyone wishing to board the ride with the guest must also wait physically in the Stand-By line. A guest cannot hold a place in line for his group.

## B.    FastPass System

To reduce wait times, Disney developed the FastPass system, which allows guests to enter immediately at least three rides and avoid Stand-By lines. All guests have access to the FastPass system, which has evolved over the years.

Disney's present version of FastPass is the FastPass+ system. With FastPass+, a guest can make advance reservations for up to three rides for each day of his visit. A guest might reserve one ride at 10:00 a.m., one at 1:30 p.m., and one at 4:00 p.m. At each of those reserved times—or within an "arrival window" around the reserved time—the guest can go to the ride and board through the

express FastPass line, which typically involves a wait of no more than 5 to 10 minutes.  This eliminates the need to stand physically in a line for those three rides.

FastPass+ reservations are available on a first-come, first-served basis. FastPass+ reservation times are part of each ride's capacity inventory.  Once capacity is reached for the ride, no more FastPass+ reservations for that ride are granted for that day.  All guests who have purchased an admission ticket to a theme park can make their FastPass+ selections up to 30 days in advance.  If a guest is staying at a Disney Resort hotel, the guest can make his FastPass+ selections up to 60 days prior to check-in.

The FastPass+ system has another valuable benefit.  After the guest has used his three advance FastPass+ reservations each day, the guest while in the park can make another FastPass+ selection, depending on availability.  The guest can make this fourth reservation at the rides, at in-park kiosks, or on Disney's mobile app. After using his three advance FastPass+ reservations, the guest may hold only one subsequent reservation at a time.  The guest must use that fourth reservation before the guest makes a fifth.

Guests in the park who did not make advance reservations can still use the FastPass+ system and make reservations at rides, kiosks, or on the mobile app. However, for the most popular rides, the FastPass reservations for a given day may already be taken by the time the day begins.

7

## C.    Re-admission Passes

Disney's staff also issues a limited number of instant access passes, known as re-admission passes or Re-ad Passes.  A Re-ad Pass allows a guest to access immediately a ride by going to the short FastPass line.  A Re-ad Pass is good for one person and one use only.  Disney's park employees, known as "cast members," can issue Re-ad Passes at Guest Relations or out in the park.

A Re-ad Pass has benefits over a FastPass reservation.  A guest can use a Re-ad Pass at any time and for any ride, whereas a FastPass reservation is for a specific ride at a set time and must be used within an hour of that time.  To illustrate, if a guest has two Re-ad Passes, the guest can access the same ride twice, even if it is the most popular ride with a long Stand-By wait time.

A guest cannot purchase or reserve a Re-ad Pass.  Disabled guests can request Re-ad Passes at Guest Relations, but the staff has discretion whether to grant them.[3]  Re-ad Passes are also an ameliorative tool that cast members may deploy when a guest, whether disabled or not, has a negative or disappointing experience.

---

[3]The record does not contain written guidelines of how Guest Relations exercise their discretion when issuing Re-ad Passes.  Disney trains Guest Relations cast members to work with disabled guests, determine how long their park visit will be, help with planning, and evaluate whether Re-ad Passes are necessary.

### D.    Disability Access Service Program (DAS)

Disney's primary accommodations for guests with cognitive disabilities, including autism, involve the DAS program, where Disney issues a special access card to disabled guests (the "DAS Card").  Disney introduced the DAS program on October 9, 2013.  Disney's website has a 23-page resource guide, entitled "Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD)" (the "Guide").  As to the DAS program, its website also includes a 2-page "Fact Sheet" and a Frequently Asked Questions ("FAQs") section.  The DAS program is designed for guests who are unable to tolerate extended waits at rides due to their cognitive disabilities.

DAS Cards are obtained at Guest Relations, which is typically located near the main entrance of a park.  Disney does not require disabled guests or their parents to present any medical information or proof about their autism or cognitive disabilities to obtain a DAS Card.  Rather, the parent or other person with the guest goes to Guest Relations at the main entrance and advises Disney that the group includes a disabled guest.  The registration process includes taking a photo of the guest or a guardian.  Disney then issues the DAS Card.

The DAS Card provides significant benefits.  The DAS Card allows a disabled guest to obtain scheduled times for all rides, so that he never has to stand

9

physically in a line for any ride at any time.  After the DAS program was introduced, all plaintiffs ultimately visited a Disney park and received a DAS Card.

The way the DAS program works is this.  A guest holding a DAS Card can obtain a "return time," also known as an "appointment time," to visit the rides in the park.  DAS "return times" are available either at the individual rides or at kiosks throughout the park.  The disabled guest does not personally need to be present to obtain a "return time"; anyone in the guest's group can do so.  However, the DAS Cardholder must be present to board the ride and "redeem" the return time.  When the disabled guest and his group arrive at that "return time," they board the ride through the short FastPass line, with very little to no wait.

Once the "return time" is obtained for a ride, the guest and his entire group are not required to wait in the physical Stand-By line for that ride.  The disabled guest and his group can use that interval time, which is unavailable to nondisabled guests, to enjoy the many other activities of the park.  Those activities include parades, concerts, characters, shows, restaurants, stores, attractions, and even rides with no wait at all.

For example, at 10:00 a.m. a disabled guest and his group could obtain a return time of 11:30 a.m. for the most popular ride that has long wait times, and then, between 10:00 a.m. and 11:30 a.m., they could visit rides or attractions that have no wait or could use one of their three FastPass+ reservations to access a ride

10

with a wait.  Kiosks in the park, as well as Disney's mobile app, tell guests what other rides currently have no wait at all or the amount of the wait time if there is one.

The disabled guest and his group may hold only one DAS Card "return time" at a time.  Once they go on the ride, they can schedule another "return time" at the ride or a kiosk.  While the guest can have only one return time at a time, DAS Card entitlements never run out for the day and can always be requested.

The DAS Card works on the same principle as the FastPass system but has more benefits.  First, although a disabled guest with a DAS Card (like any guest) can still make three FastPass+ reservations in advance, the DAS Cardholder does not need to wait until his three FastPass+ appointments are used before obtaining an additional "return time."  Rather, the DAS Cardholder can begin making appointments with his DAS Card as soon as he arrives at the park in the morning, including when he initially obtains his DAS Card at Guest Relations.  Thus, every DAS Cardholder enters a Disney park with four opportunities to enter the FastPass line for different rides: the three advance reservations through FastPass+ and the first DAS Card "return time."

Second, with a DAS Card, a disabled guest's appointment time is good until the end of the day.  The guest is not obliged to board the ride at a particular time or

11

even within an arrival window.  Instead, the DAS guest may return to the ride at any point after the scheduled return time and still board immediately.

Third, when a ride has a posted wait time of 15 minutes or less, a DAS Cardholder is allowed to board the ride immediately, with no wait at all.  This feature is unique to the DAS Card and can be done all day long with no limitation.  The majority of Disney's rides have wait times of 15 minutes or less.  And if a popular ride has a posted wait time of an hour, a guest with a DAS Card can obtain a "return time" for that ride and then, in the intervening time, that guest can go on three rides with wait times of 15 minutes or less and be waved right in to those rides.

By contrast, nondisabled guests who wish to ride the same popular ride—except those who used one of their three FastPass+ reservations—must wait in the physical Stand-By line.

In sum, the DAS Card undisputedly does three things: (1) it eliminates the need for a disabled guest to wait in a physical line, even for popular rides with long waits; (2) it provides a disabled guest with immediate access to rides that have a wait of 15 minutes or less; and (3) if a DAS Cardholder wishes, it provides access to more rides in a day than are available to a guest without a DAS Card.

12

When first introduced, a DAS Card was a physical card, but now it is loaded onto the guest's electronic ticket.  Every member of the group is electronically associated with the DAS Cardholder.

## E.    Individualized Accommodations

Disney also offers more individualized accommodations to guests who obtain a DAS Card.  In its Guide, Disney acknowledges that some cognitively disabled guests may need more individualized accommodation, stating:

> To access our attractions, Guests with cognitive disabilities have several options including use of the standard queue, Disney FASTPASS service, Disney FastPass+, the Disability Access Service Card, and/or additional accommodations based on individual service need.  To determine which option or options are best for your party, visit the Guest Relations lobby location near the entrance at any of the four Theme Parks.

(emphasis added).  The Guide directs guests to inquire about additional accommodations at Guest Relations, explaining: "To learn more about the Disability Access Service Card as well as additional accommodations available based on individual service needs, visit the Guest Relations lobby location near the entrance at any of the four Theme Parks."

Disney's public FAQs include: "What will Disney Parks do if a Guest is concerned the DAS Card doesn't meet their needs?"  The FAQ's respond that guests should go to Guest Relations to discuss special accommodations if they are concerned the DAS Card does not meet their needs.

13

A Disney operations manager described other accommodations based on needs as: (1) planning an itinerary through an in-person meeting at Guest Relations; (2) writing in the first attraction to be visited on the DAS card, (3) issuing attraction Re-ad Passes, and (4) thoroughly explaining the FastPass+ system. When helping plan an itinerary, a Guest Relations cast member takes into account the guest's plans, the weather, and "the environment of the day," given that certain days and times are busier than others.

In addition to the DAS Card, some plaintiffs requested and received Re-ad Passes, which provide immediate access to a ride. Some requested Re-ad Passes but did not receive as many as they wanted. Some plaintiffs received Re-ad Passes during some visits but not during other visits. Some plaintiffs do not mention Re-ad Passes at all in their affidavits or depositions.

## F.    Advance Planning

While Disney offers assistance, its Guide also recommends that families with a cognitively disabled guest plan their visits in advance. The Guide suggests that families (1) purchase their tickets in advance to avoid the possibility of waiting in line at ticket locations, (2) create or review a visual schedule or timeline of the day, (3) go over the timeline to help the disabled guest learn the routine, (4) study maps of the theme parks, (5) watch videos describing different rides, so they know what to expect, and (6) practice waiting in line. The Guide also provides guests

with a list of every ride in each theme park and indicates which rides include scents or smells, flashing lights, loud noises, periods of darkness, bumps, a fast pace, elevation off the ground, wetness, or an element of surprise.

The Guide suggests that a family with a disabled guest may wish to bring these items on their visit: ear plugs or headphones to protect against loud noises; a favorite device or activity that might distract and keep a disabled guest occupied during any periods of waiting; reinforcers for good behavior; a calming sensory toy to protect against over stimulation; and a bracelet or nametag with contact information.

Having outlined Disney's current pass system and cognitive disability program, we examine the evidence about plaintiffs' severe disabilities and why plaintiffs claim Disney's DAS program does not adequately accommodate them.

## II.    AUTISM AS A DISABILITY

All but 4 of the 36 plaintiffs-appellants are on the autism spectrum.  Some plaintiffs identify autism as their only disability, whereas many plaintiffs experience other disabilities in addition to autism.  These other conditions include Down syndrome, attention deficit hyperactivity disorder, verbal apraxia, oppositional defiant disorder, obsessive compulsive disorder, Hirschsprung's disease, atresia, megacephaly, hydrocephalus, cranial cysts, cerebral palsy, sensory

15

disorder, and/or bipolar disorder, among others.  Because plaintiffs' evidence and briefs focus on their autism-related impairments, we do too.[4]

Plaintiffs divide the varying degrees of autism into three main groups: high functioning, mild or moderate, and severe.  Disney has not tried to claim that some plaintiffs' autism or other cognitive disabilities are more severe than others.  Rather, for purposes of summary judgment, Disney accepts that all plaintiffs have severe autism.

Given their severe disabilities, plaintiffs contend that: (1) although the DAS Card eliminates waiting in a physical line, plaintiffs still must endure a "virtual" wait to go on their rides of choice; (2) plaintiffs cannot comprehend time, defer gratification, and wait virtually for rides; (3) plaintiffs must visit rides in a pre-set order, including repeat turns on the same ride; and (4) Disney must provide them a pass to all rides that guarantees a maximum 10 to 15 minute wait, including repeat turns on the same ride.  In response, Disney claims plaintiffs' requests for near immediate entry to all rides in a pre-set order without a virtual wait do not flow from their neurological impairments (as plaintiffs claim) but from their or their parents' personal preferences (as the district court found).

---

[4]The 36 plaintiffs are in 30 families, hence 30 lawsuits.  At oral argument, plaintiffs' counsel made clear that no plaintiff is high functioning and no plaintiff could be described as moderately autistic.  Four individual plaintiffs do not have an autism diagnosis but are "severely challenged in other ways."  Plaintiffs in the separate lawsuits who were more high functioning did not appeal.

16

The critical evidentiary debate in this case is over two behavioral challenges that plaintiffs claim arise from their severe autism: (1) the inability to wait; and (2) adherence to the same routine. We first discuss some general medical and behavioral facts about autism that are not in dispute. We then examine the conflicting evidence about these two behavioral challenges at issue.

Generally, autism spectrum disorder ("ASD") and autism are terms for a group of complex disorders of brain development. The spectrum of disorders encompassed by these terms is very broad; individuals with autism may be mildly affected or may be profoundly disabled. Autism is characterized by difficulties in social interaction, verbal and nonverbal communication, learning, and repetitive behaviors. The disorder can be associated with intellectual disability, difficulties in motor coordination and attention, and physical health issues. See Garrido v. Dudek, 731 F.3d 1152, 1155 n.1 (11th Cir. 2013).

Both parties cite the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), which sets forth the diagnostic criteria of autism, including these deficits:

> A. Persistent deficits in social communication and social interaction across multiple contexts, as manifested by the following, currently or by history (examples are illustrative, not exhaustive, see text):
>
> 1. Deficits in social-emotional reciprocity . . . .

17

> 2. Deficits in nonverbal communicative behaviors used for social interaction . . . .
>
> 3. Deficits in developing, maintaining, and understanding relationships . . . .

Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-5") 50–51 (5th ed. 2013).  The DSM-5 also includes these behaviors and interests as diagnostic criteria:

> B. Restricted, repetitive patterns of behavior, interests, or activities, as manifested by at least two of the following, currently or by history (examples are illustrative, not exhaustive, see text):
>
> > 1. Stereotyped or repetitive motor movements, use of objects, or speech . . . .
> >
> > 2. Insistence on sameness, inflexible adherence to routines, or ritualized patterns of verbal or nonverbal behavior . . . .
> >
> > 3. Highly restricted, fixated interest that are abnormal in intensity or focus . . . .
> >
> > 4. Hyper- or hyporeactivity to sensory input or unusual interest in sensory aspects of the environment . . . .
>
> [ . . . . ]

<u>Id.</u>

Autism is also understood as a brain-based disorder.  Research suggests that functional areas within the brains of people with autism are not as well-coordinated as those within normally developing brains.  Research has identified other biological or structural differences between the brains of people with autism and

18

normally developing brains, "especially related to volumes of gray matter versus white matter, and regional variations in structures such as the corpus callosum, limbic system, cerebellum, basal ganglia, thalamus, and frontal lobes."  One study found that "there is often unusually accelerated head and brain growth during the first two years of life in many individuals with [autism]."

Under the above section discussing "insistence on sameness" and "adherence to routines," the DSM-5 provides examples of behaviors including "extreme distress at small changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take same route or eat same food every day." See DSM-5 at 50. Courts recognize this aspect of autism.  See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. ___, ___, 137 S. Ct. 988, 996 (2017) ("Autism is a neurodevelopmental disorder generally marked by impaired social and communicative skills, engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." (quotation marks and citations omitted)); United States v. Spero, 382 F.3d 803, 804 n.3 (8th Cir. 2004) ("Affected individuals may adhere to inflexible, nonfunctional rituals or routine." (quoting Physician's Desk Reference Medical Dictionary 171 (2d ed. 2000))).

This much the parties agree on.  Against this background, we review plaintiffs' evidence about the two claimed behavioral challenges of autism at issue.

19

### III.    PLAINTIFFS' EVIDENCE

### A.    Testimony of Plaintiffs' Parents

Plaintiffs submitted this lay evidence through their parents' depositions and affidavits about the specifics of their disabilities.[5]  As a result of their severe autism disorders, plaintiffs are largely nonverbal, will never intellectually develop beyond an early childhood level, and will never develop social skills to even that level.  They exhibit a wide array of conditions, disabilities, non-social behaviors, and compulsions.

Plaintiffs' parents similarly aver that their child has (1) an inability to wait and delay gratification, and (2) a required adherence to routine.[6]  The issue for plaintiffs is not merely waiting in a physical line but waiting at all for a ride in a high-stimulus environment.

According to their evidence, plaintiffs cannot comprehend the concept of time and are unable to wait and delay gratification for more than 10 to 15 minutes.  For plaintiffs, waiting at all to go on a ride is simply doing nothing in the present, not anticipating something which will occur in the future.  It is not a matter of

---

[5]While Disney initially moved to exclude the testimony and report of plaintiffs' expert, there was no motion to strike the affidavits or deposition testimony of plaintiffs' parents.  The district court referred to that evidence, as does Disney in its appellate briefs.  The dispute is over whether that testimony, along with plaintiffs' expert, creates an issue of material fact.

[6]At oral argument, plaintiffs' counsel stated that "[n]early all" plaintiffs "have the need for routine," and "[a]ll have the inability to defer gratification."  In this regard, seven plaintiffs testified they have no pre-set order or routine.

20

learning; it is the nature of the neurological disability that makes waiting an impossibility.

Nearly all parents attested that their child has great difficulty waiting. Most parents used phrases such as "inability to wait," "no ability to understand a concept such as waiting," "unable to wait for long periods of time," or "impossible . . . to wait for long periods of time, even if the wait is not standing in a line." Several parents further attested that their children are "unable to understand the concept of time to any extent comparable to non-disabled persons," and/or that their children "[do] not understand that a positive or fun event or activity will unfold in the future if [they] wait[] calmly or idly in the present."

Nearly all parents also testified that riding in a car, for any period of time, is not comparable to waiting for an attraction at an amusement park. Some parents explained that "riding in a car is itself an activity; it is not idly waiting for a different activity." In a few cases, a plaintiff's parent testified that the plaintiff enjoys riding in a car as an activity in and of itself. Most often, the parents attested that for their autistic child, a car is a more tolerable environment than an amusement park. A car is a "calm and controllable" environment, in which a person with autism can take a nap, use an "iPad," watch movies, listen to music, read books, and enjoy other distractions. In a car, "[t]he temperature, smell, noise level, amount of light, number of people and exposure to textures can be

21

manipulated to meet the needs of the person with autism by the parent." Riding in a car "involves motion and movement," which can be soothing for a person with autism. This stands in contrast to an amusement park, which involves "stimuli of all kinds" and noise levels that "can't be controlled."

As to adherence to routine, most parents testified that their children rely on an expected, pre-set order of events and have difficulty when that order is disrupted. Some plaintiffs live near and have visited a Disney park 10, 15, or 20 times or more. One parent described her son as being "incapable of deviating from consistency, order and routine" when visiting a Disney park. Another parent testified that her son has "an innate sense of the order or sequence in which we will travel and experience the attractions," and that "[i]f that order is disrupted, he becomes immediately emotionally unstable." Other parents testified similarly, stating that a plaintiff "has a specific list and an order of the rides he must go on," or that a plaintiff has a "need to do things in a certain sequence" that would be "completely disrupt[ed]" by the DAS program.

Some parents attested to their children's reliance on predictability and routine without explicitly tying it to a theme park experience. Examples of such statements include: a plaintiff "follows routines and very structured schedules in nearly every activity and aspect of his life, and becomes very unstable when unexpected events or stimuli occur"; a plaintiff "does not handle transition or

22

changes to his routine"; a plaintiff "is very focused on routine" and any change "can trigger his behaviors"; or a plaintiff "is very rigid in his schedule and routines."

Parents also testified about what happens when their autistic child has to wait to get on a ride or is not able to get on the rides in the same routine order developed from prior visits. When this happens, each plaintiff is vulnerable to a "meltdown." What constitutes a meltdown is somewhat different for each plaintiff.

For many plaintiffs, meltdowns include self-harming behavior. According to their parents' testimony, one plaintiff "hits herself, drops to the floor and screams in terror," another plaintiff "might smack/slug his face, and or go to the ground and bang his head on the ground," and a third plaintiff "can be self abusive, including scratching her own face, hitting her head on the ground, jumping in the air and landing on her knees, biting herself . . . pulling off her own finger and toe nails, and scratching and picking at open sores to make them bleed." Along with self-harm, some plaintiffs exhibit aggressive behavior that risks harming others: one plaintiff "can hit and kick any object around him"; another "starts to scream and physically grab those around him."

Some plaintiffs' meltdowns are not violent, but still include behaviors that can be disturbing to other people. Meltdowns can manifest as a child "[s]oiling her pants," "repeatedly lick[ing] her glasses," "running with his hand in the air

23

laughing, screaming, and throwing things," or "jumping up and down, flapping hands wildly, screaming loudly (out of boredom and anxiety), falling to the ground, touching anyone and everyone, eating items from the ground out of boredom, pulling stuff off of purses, bags, strollers, and anything within reach." In some cases, a plaintiff experiencing a meltdown "might 'go to the ground' and completely withdraw" while covering his ears and/or his face.

The effect and severity of a meltdown also can vary because plaintiffs are individuals of different ages and sizes. Some plaintiffs are young children. By contrast, plaintiff M.A.C., age 20, is 5'10" tall and 250 pounds, and plaintiff A.L., age 22, is 6'6" tall and weighs "over 300 pounds." Plaintiffs who are younger and smaller may be more safely contained and controlled during a meltdown. Although the nature and severity of the meltdown may vary, plaintiffs' evidence, as a whole and in the light most favorable to plaintiffs, is that their child needs a maximum wait time of 10 to 15 minutes at all rides to avoid a meltdown and having to leave the theme park.

In this regard, the testimony and affidavits of each plaintiff's parents discuss in great detail what happened when they visited a Disney park. We give a few examples of an individual plaintiff's experience with the DAS Card.

24

**B.    Day-in-the-Park Narratives for Plaintiffs A.L., A.B., S.M., and J.M.**

Plaintiff A.L. is a 22-year-old man with autism.[7]  He grew up in Florida not far from Disney World.  A.L. visited the parks often and developed a routine of the same rides, in the same order.  A.L.'s mother testified that when A.L. visits the parks, he creates a list of his favorite rides in order, and crosses the rides off the list as he visits each one.  A.L. would have a meltdown if he did not complete the list once he started it.

A.L. typically visited Epcot or the Magic Kingdom.  At Epcot, A.L. would ride Test Track, Mission Space, Spaceship Earth, the Seas with Nemo and Friends, Soarin', and Journey Into Imagination.  At the Magic Kingdom, A.L.'s "normal pattern" was to go on 19 rides in order, but sometimes he would skip a ride.  His mother explained, "It's always the same route.  It doesn't mean that he hits every single ride, but it is always the same route."

On December 19, 2013, A.L.'s family made their first visit to the Magic Kingdom since the introduction of the DAS Card.  They arrived at 4:38 p.m.  The family, a group of six, went to Guest Relations, where they received a DAS Card and 24 Re-ad Passes, or 4 per person in the group.  A cast member went over a map of the park and offered to help plan a route.

---

[7]All ages are as alleged when the individual plaintiffs filed their complaints.

25

The family then entered the park.  The first ride A.L. wanted to ride that day was Jungle Cruise.  A.L.'s mother used the group's DAS Card at Jungle Cruise, and received a "return time" of 45 minutes later at Jungle Cruise.  A.L.'s mother "knew that [A.L.] immediately needed, wanted to go on the Jungle Cruise," so instead the family members each used one of their Re-ad Passes to board the ride immediately.  The family determined that with only three Re-ad Passes remaining per person, it would not be possible to visit all of A.L.'s regular rides in order without some waiting, and that they would need to leave the park.  A.L.'s mother was able to "redirect [A.L.] off of his route" by getting him to "look at the parade, look at the show," which allowed the family to keep A.L. calm as they left the park.

Plaintiff A.B. is a six-year-old boy with autism.  He lives not far from Disney World in Florida.  After the DAS Card was introduced, A.B. visited Disney in October 2013 and received a DAS Card but no Re-ad Passes.

The family used their DAS Card to obtain a return time at A.B.'s favorite ride, where the wait time was 1 hour and 15 minutes.  The family got lunch during the wait, then returned and went on the ride.  A.B. wanted to ride it again, so the family obtained a second return time and, when the time came, went on the ride again.  Faced with waiting a third time before going on the same ride again, A.B.

26

had a meltdown.  A.B. had two subsequent meltdowns during his October 2013 visit, causing the family to cut the visit short.

The family returned to Disney World in December 2013, and again in 2015 and 2016.  On their recent visits, the family used their DAS Card to obtain return times and used the FastPass+ system to make advance reservations for rides.  On at least one subsequent trip, the family received Re-ad Passes.  Nevertheless, the family had dissatisfying experiences at the parks due to A.B.'s meltdowns.

Plaintiff S.M. is a six-year-old boy with autism, sensory processing disorders, sensory integration, apraxia, and attention deficit hyperactivity disorder.  His sister, plaintiff J.M., is a seven-year-old with verbal apraxia, oppositional defiant disorder, and severe attention deficit hyperactivity disorder.  The family lives in Ohio.

S.M.'s mother testified that "[a]s a result of his autism, S.M. does not handle transition or changes to his routine."  S.M. can manage short waits of 10 to 15 minutes, but longer waits can require some kind of external distraction, such as an "iPad."  S.M.'s sister J.M. is able to wait, but she has anxiety and social issues waiting in lines with many other people.

In December 2013, the family visited the Magic Kingdom, where they obtained a DAS Card and received Re-ad Passes.  The family used the DAS Card

27

in conjunction with FastPass+ and Re-ad Passes.  One of J.M. and S.M.'s older siblings had to run from ride to ride to get return times.  The mother testified:

> [E]very time [S.M.] saw a ride, he started freaking out and wanting to go immediately.  So we got smart and [had the elder sister] running to get return times, and we were trying to coordinate those with the [Re-ad Passes] that we had in conjunction—or in the case of one other park, the Fast Pass Plus.

Even with the DAS Card and Re-ad Passes, J.M. and S.M. were not able to experience the park in a sequence that was tolerable for them.

The record contains similar day-in-the-park narratives from all 36 plaintiffs.

## C.    Expert Dr. Joette James

Plaintiffs also submitted an expert's report and medical studies about the characteristics of autism.[8]  Plaintiffs' autism expert, Dr. Joette James, Ph.D., is a clinical neuropsychologist with a specialization in developmental disabilities.  In her report, Dr. James emphasized the "brain-behavior relationships" that inform scientific understanding of autism.  According to Dr. James, individuals with autism present deficits in "executive functions."  Dr. James reported: "Good executive functioning requires sustained attention and effort, inhibition of

---

[8]The parties each filed motions to exclude certain expert reports or portions of them based on, inter alia, Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993). The district court granted summary judgment in favor of Disney and did not rule on those motions.  At this juncture, we consider these expert reports as part of the record on appeal.

28

impulses, sound working memory (mental manipulation abilities), as well as clerical and conceptual organizational abilities."

By contrast, Dr. James indicated that individuals with autism, like plaintiffs, demonstrate "global deficits in executive functioning, both in terms of behavioral regulation (i.e. impulse control, emotional control, flexibility), and in terms of metacognitive skills (i.e. initiation, independent planning/organization, working memory, and self-monitoring)." Dr. James explained that "[i]ndividuals with poor executive control typically have difficulty regulating their emotions, controlling impulses, using good judgment, sustaining attention, making sound decisions, initiating appropriate courses of action, and flexibly changing course when receiving feedback that current plans of action and behavior are not working."

In persons with autism, the need for "sameness and consistency . . . often leads to high levels of anxiety when there are even minor changes in their routines." Dr. James cited a study of school-age children, which found that individuals with autism "struggled particularly with shifting- that is, the capacity to move freely from one situation, activity, or aspect of a problem to another as the situation demands, to transition, and solve problems flexibly."

Dr. James considered the example of the lead plaintiff in this case, A.L., whom she characterized as both severely disabled and having symptoms and behaviors like many individuals with severe autism. Dr. James opined that, "[l]ike

29

many individuals with ASD, A.L. demonstrates significant executive dysfunction, and problems with emotional/behavioral regulation, flexibility, working memory, and language." In particular, Dr. James opined that: (1) "characteristic of individuals with ASD, A.L. also experiences significant difficulty with flexibility and anxiety"; and (2) "while [A.L.] can tell time, he does not comprehend the concept of time, nor is he able to 'hold onto' the idea of time in such a way as to accurately judge its passage," which "significantly affects A.L.'s ability to wait." Dr. James noted that A.L. has a "high level of rigidity" and a "biologically driven need for consistency and sameness," which results in his having a "nearly inflexible order in which he approaches the rides and attractions at Disney."

Dr. James also testified that for a person with autism, a routine or prescribed order is "more than [a] preference," and is "a biologically driven mechanism." Any deviation from the expected order can lead to a "behavioral meltdown" or "some kind of outburst," even if plaintiffs never need to wait in a physical line for a ride, and even if plaintiffs always have some alternate activity or ride in the park available.

## D.    Scientific Studies

As to routine and sameness, one study, cited by plaintiffs, notes that "[c]hildren with ASDs may protest vigorously when forced to transition from an activity or topic of interest or when a usual routine is changed." Chris Plauché

30

Johnson & Scott M. Myers, Identification and Evaluation of Children with Autism Spectrum Disorders, 120 Pediatrics 1183, 1194 (2007).  Plaintiffs cite another authority that describes "the need to preserve sameness" as one of the "behavioral symptoms seen in children with autism."  Comm. on Educ. Interventions for Children with Autism, Nat'l Research Council, Educating Children with Autism 97 (Catherine Lord & James P. McGee eds., 2001).  The same book suggests that these "behavioral symptoms" are related to "physiological abnormalities" including "physiological overarousal to novel events and underarousal and slower rates of habituation."  Id.

As to the inability to defer gratification, plaintiffs cite a study which found that children at the high functioning end of the autism spectrum demonstrated a reduced ability to exercise "effortful control" and delay gratification.  Susan Faja & Geraldine Dawson, Reduced Delay of Gratification and Effortful Control Among Young Children with Autism Spectrum Disorders, 19 Autism 91, 99–101 (2015).  That study examined 42 children, half of whom had autism and half of whom did not.  Id. at 93.  One at a time, the children were left for 15 minutes alone in a room, where they were seated at a table with a small candy treat and a larger candy treat.  Id. at 95.  The children were not told the wait time, but were told that if they waited at the table until the investigator returned, they could have the larger treat, but if they did not wait, they could have only the smaller treat.  Id.

31

The investigators found that, compared with typically developing children, the rate of children with autism who passed the test by delaying gratification for the entire 15 minutes was lower. Id. at 97. The investigators observed that this result was "consistent with the theoretical prediction that executive control may be disrupted for a subset of children with ASD." Id. The investigators also noted that the result was consistent with information gathered from the parents of the children with autism, who reported that their children were less likely than typically developing children to exhibit characteristics "such as the ability to show strong concentration, persist with tasks, wait before engaging with a task, easily stop an activity when told 'no,' and enjoy just sitting quietly." Id. Plaintiffs claim their impairments are far more severe than those in the Faja-Dawson study.[9]

## IV.   DISNEY'S EVIDENCE

Disney's evidence directly contradicts plaintiffs' evidence about these two behavioral challenges. Disney submitted expert reports from Dr. Jill Kelderman, Ph.D., a pediatric neuropsychologist, and Dr. Jack Spector, Ph.D., a clinical neuropsychologist.

---

[9]Plaintiffs submit that "[t]he Faja-Dawson study specifically examined children with ASD who did not have significant intellectual impairment—they had IQs similar to those of the control group of typically-developing children. Nor did the ASD children have diminished verbal skills in comparison to the typically-developing children. Even with comparable intellectual and verbal skills, the ASD children showed a diminished capacity to wait for delayed gratification." (citations omitted).

A.      **Expert Dr. Jill Kelderman**

As to autism generally, Dr. Kelderman acknowledged that individuals with autism spectrum disorder can evince "[r]igidity, which can include insistence on sameness or nonfunctional routines . . . to varying degrees."  Dr. Kelderman opined, however, that these and other behaviors can be managed, stating: "Behavior modification strategies are helpful in reducing and accommodating symptoms of ASD"; and "[s]elf-control in young children with ASD can be increased by gradually exposing the child to progressive delays, when given the choice to engage in an intervening activity during that delay" (internal citations omitted).

Dr. Kelderman explained that "[i]ntroducing alternative behaviors (a technical term for distraction technique) is helpful not only for individuals with disabilities, but their typically developing peers."  For example, "providing a card game, movie, or video game to watch on a smart phone or iPad helps distract individuals and helps keep people occupied."

Dr. Kelderman testified that an inability to wait for long periods of time or understand the concept of the passage of time is "not part of the diagnostic criteria" for ASD, is not a central component of ASD, is not a frequently occurring symptom of ASD, and is not a common problem of ASD.  Dr. Kelderman stated

33

that there is no body of research outlining the inability of people with autism to (1) "browse" or to (2) "impulsively enjoy substitute experiences."

However, Dr. Kelderman acknowledged that individuals with autism can have more difficulty with waiting than do people without autism, "because it is anxiety-provoking." Dr. Kelderman explained that this anxiety "manifests particularly in social situations, lots of commotion, loud environments, novel environments where they're not sure what's going to happen next. These types of things—many individuals with ASD are more prone to experience anxiety in these events."

As to the Disney experience, Dr. Kelderman's report pointed to Disney's Guide, which advised that "[p]arents are strongly encouraged to prepare ahead of time" for their visits. Dr. Kelderman opined that the families' "expectation that any child with ASD should have immediate, unfettered access to the rides and attractions of their choice at Walt Disney World is not a requirement of the disability; rather, it is a preference or expectation that children with ASD and their families have when visiting the parks."

Dr. Kelderman observed that "[w]aiting is an inherent, unavoidable aspect of our culture and it is part of the daily life of children with and without ASD." Dr. Kelderman opined that "children with ASD are not incapable of waiting or

unable to delay gratification," and that a preference to visit attractions in a particular order "is neither a requirement nor an inherent characteristic of ASD."

Dr. Kelderman explained her opinion as follows: (1) that "[b]y eliminating the wait time in some instances and decreasing it in others, individuals with ASD spend minimal amounts of time standing in a line under DAS"; and (2) that "[a]s a result, providing a virtual wait allows individuals with disabilities more access to park experiences, as it frees up hours of time that would otherwise be spent standing in line." Dr. Kelderman concluded that, given the accommodations under the DAS Card, which are available to individuals with autism, "providing repeated, near-immediate entry to rides and attractions . . . is not necessary to afford access to Disney's theme parks."

## B.    Expert Dr. Jack Spector

Disney's second expert, Dr. Spector, was retained to review and opine on the expert report of plaintiffs' expert, Dr. James. Dr. Spector disagreed with Dr. James's opinion. Dr. Spector noted that "[c]hildren, developmentally disabled or not, typically do not handle delays and waits" as well as adults do, and "may have little experience with having to wait in line as much as is required on a typical day at a Disney theme park."

Dr. Spector opined that the inherent challenges of taking any child to a Disney theme park make it difficult to attribute any particular negative experience

35

to autism.  Dr. Spector explained: "While there may be times when a particular child's particular problem behaviors and idiosyncrasies may impact their theme park experience," there is no evidence presented that children with ASD as a group: (1) manifest "a complete inability to delay or defer gratification"; (2) "are incapable of waiting in lines"; and (3) "require repeated turns on the same ride or group of rides in particular sequence."  Dr. Spector opined that parents of children with autism are capable of "utilizing the same behavioral tactics, plans, and preparations as do every other parent anticipating a visit to a Disney theme park."

In Dr. Spector's opinion, Dr. James's "flawed causation analysis fail[ed] to address any of a number of different causes"—including the particular child's expectations, skills, adaptability, health, fatigue, and resilience on a given day— that could contribute to a behavioral "meltdown" at a Disney theme park.

Having reviewed the evidence, we outline the procedural history that led to the summary judgment motions.

## V.    PROCEDURAL HISTORY

These 30 lawsuits on appeal began as 44 separate lawsuits in the district court.  Some of the 44 lawsuits were filed originally in the U.S. District Court for the Central District of California, and were transferred to the district court in Florida.  Other lawsuits were filed originally in the district court in Florida.

36

Plaintiff A.L.'s action was commenced in April 2014, approximately 6 months before the other 43 actions.

In all 44 lawsuits, the complaint contained one count under the ADA for each plaintiff, asserting that (1) they suffered from autism and/or cognitive disabilities, and (2) Disney's DAS Card violated the ADA because it did not allow plaintiffs to go on rides without waiting and in the order they wanted. Plaintiffs sought injunctions requiring Disney to modify the DAS Card to provide additional accommodations.

Discovery concluded in the A.L. action first, and Disney moved for summary judgment. In April 2016, the district court granted summary judgment for Disney in the A.L. case. A.L. appealed.

The other 43 cases proceeded several months behind the A.L. case. During the litigation, 6 of the plaintiff families voluntarily dismissed their claims, leaving 37 separate lawsuits. After Disney won summary judgment in the A.L. case, Disney moved for summary judgment in each of the other cases. In September 2016, the district court granted summary judgment for Disney in the 37 remaining cases.

The district court entered substantially the same summary judgment order in each case. The district court found that plaintiffs' sole ADA claim arose under § 12182(b)(2)(A)(ii) of Title III, and involved Disney's alleged failure to make

necessary and reasonable modifications to its procedures to accommodate plaintiffs' disabilities. The district court determined that there were no issues of material fact and that plaintiffs had not made the required showing that their requested modifications were "necessary" to afford them "equal access" to the benefits of a Disney theme park.

The district court concluded that plaintiffs' requested additional modifications were unnecessary for three main reasons: (1) Disney provided plaintiffs an opportunity to gain a like benefit from its parks that is enjoyed by nondisabled individuals; (2) plaintiffs can all wait in a car or a plane to get to Disney's parks, and therefore plaintiffs can wait virtually with a DAS Card to access rides at scheduled times; and (3) DAS is an existing means to equal access. In those cases where the issue was contested, the district court also concluded that plaintiffs "can deviate from [their] preordained route[s]."[10]

Because plaintiff A.L. appealed first, his appeal was briefed separately. Twenty-nine of the other 37 families appealed. Those 29 appeals were consolidated for briefing in this Court.

_____

[10]While the district court also concluded that plaintiffs lack standing, Disney now agrees that plaintiffs have standing, and independently we agree too. See White's Place, Inc. v. Glover, 222 F.3d 1327, 1328 (11th Cir. 2000) ("We cannot proceed without determining that standing exists, even if both parties concede jurisdiction.").

38

## VI.    STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo.  Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1219 (11th Cir. 2015).  A district court properly grants summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Id.; Fed. R. Civ. P. 56(a).  The court draws all inferences and reviews all evidence in the light most favorable to the nonmoving party.  Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012).  The court does not weigh conflicting evidence or determine the credibility of witnesses.  Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012); Skop v. City of Atlanta, 485 F.3d 1130, 1140 (11th Cir. 2007).

A nonmoving party seeking to establish that there is a dispute of fact must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (citing Fed. R. Civ. P. 56(e)).  The nonmoving party may not rest upon the mere allegations or denials of his pleading.  Id.  Upon discovering a genuine material dispute, the court must deny summary judgment and proceed to trial on that issue.  Jones, 683 F.3d at 1292.

39

## VII.   DISCUSSION

### A.    Title III of the ADA

In 1990, the ADA was enacted "to remedy widespread discrimination against disabled individuals" and to "provide clear, strong, consistent, enforceable standards" addressing that discrimination.  42 U.S.C. § 12101(b)(2); PGA Tour, Inc. v. Martin, 532 U.S. 661, 674, 121 S. Ct. 1879, 1889 (2001).  The ADA covers three main types of discrimination, each of which is addressed in one of the statute's three main subchapters: Title I prohibits discrimination in private employment; Title II prohibits discrimination by public entities (state or local governments); and Title III prohibits discrimination by a "place of public accommodation," which is a private entity that offers commercial services to the public.  42 U.S.C. §§ 12112(a), 12132, 12182(a); see Gathright-Dietrich v. Atlanta Landmarks, Inc., 452 F.3d 1269, 1272 (11th Cir. 2006).  Under Title III, amusement parks are defined as "public accommodations."  42 U.S.C. § 12181(7)(I).  Disney's theme parks fall within the ambit of Title III.

Title III itself contains three parts: (1) a "General rule" in § 12182(a); (2) a list of "General prohibitions" in § 12182(b)(1); and (3) a list of "Specific prohibitions" in § 12182(b)(2).  42 U.S.C. § 12182.  The "General rule" in § 12182(a) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

40

privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). As discussed later, the "General prohibitions" in § 12182(b)(1) describe ways in which discrimination may occur, and the "Specific prohibitions" in § 12182(b)(2) provide examples of actions or omissions that may result in discrimination. Id. § 12182(b).

Title III provides for only injunctive relief. See 42 U.S.C. § 12188(a) (stating "[t]he remedies and procedures set forth in section 2000a-3(a) of this title" are the remedies available to a person who is subjected to Title III discrimination); id. § 2000a-3(a) (providing for "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order"). Because only injunctive relief is available, a plaintiff is not entitled to a jury trial on Title III claims. See City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 719, 119 S. Ct. 1624, 1643 (1999).

## B.     Definition of Disability

The first element of a Title III claim is that the plaintiff must have a disability. The statutory definition of "disability" is provided before the several Titles and applies to the ADA as a whole. 42 U.S.C. § 12102. Under the ADA, a person has a "disability" if he (A) has "a physical or mental impairment that substantially limits one or more major life activities," (B) has "a record of such an impairment," or (C) is "regarded as having such an impairment." 42 U.S.C.

41

§ 12102(1). The statute provides a non-exhaustive list of "major life activities" that includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

It is undisputed that each plaintiff suffers from severe autism and/or severe cognitive impairments, is significantly limited in numerous major life activities, and qualifies as an individual with a disability within the meaning of Title III of the ADA, 42 U.S.C. § 12182(a)–(b). The quarrel here is whether Disney, through its DAS program, provides its disabled plaintiff guests with an equal benefit and a like experience to that of its nondisabled guests.

## C.    Blanket Policy

As a threshold issue, plaintiffs claim Disney's DAS program is an impermissible "blanket" or "one size fits all" policy for all disabled persons with autism and/or cognitive impairments. Plaintiffs argue that Disney's giving a DAS Card to such disabled guests violates the ADA because Disney is not making the required individualized assessment. Plaintiffs contend that Disney must undertake an individualized inquiry to determine the specifics of each guest's disability and to implement modifications tailored to each plaintiff's needs.

42

The autism spectrum is broad and has a wide array of diagnostic traits, behaviors, and challenges.  The effects of autism vary from person to person.  In turn, the benefits of a modification that are "obtainable by children at one end of the [autism] spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between."  Endrew F. ex rel. Joseph F., 581 U.S. at ___, 137 S. Ct. at 999 (discussing the need for an individualized educational program for an autistic child).

But this case is unique in two ways.  First, Disney has not contested that all plaintiffs have severe autism and/or cognitive impairments.  Rather, Disney claims its DAS Card is a full and complete accommodation for cognitively disabled guests, no matter how severe or mild their conditions.  If Disney's DAS program accommodates the needs of the most severely impaired child on the autism spectrum, then Disney claims that its DAS program necessarily accommodates the needs of the less impaired autistic child.

Second, based on annual figures, Disney has about 55,000 visitors a day at Magic Kingdom and a minimum of 26,000 visitors a day at other parks.[11]  Given this volume of guests, Disney has chosen to accept each guest's verbal representations as to his disability without requiring any proof and issues him a DAS Card, no matter how slight or severe the autism or cognitive disability.

---

[11]Themed Entm't Ass'n, Theme Index and Museum Index 2017: Global Attractions Attendance Report 10 (2018).

Under the factual circumstances of this case, we conclude that Disney's generalized issuance of DAS Cards, in and of itself, does not violate the ADA. This is not a case where a plaintiff guest has been <u>denied</u> accommodations across the board. This is a case where a public place has many thousands of guests each day and provides an identifiable and quantifiable accommodation based on its assessment of its most severely disabled guests. <u>If</u> an accommodation <u>actually</u> provides all necessary modifications for a severe disability across the board, it does not violate the ADA. The critical inquiry here is whether Disney's DAS program adequately accommodates the most severely disabled guests and provides them an equal benefit and a like experience to that of nondisabled guests.

That an across-the-board modification, where proven necessary, does not violate the ADA is illustrated by the fact that plaintiffs actually request a pass system with a uniform ingredient: a guaranteed maximum wait time of 10 to 15 minutes for all rides for all cognitively disabled plaintiffs at all times at all parks. Plaintiffs request this standardized pass to create a "predictable experience" for autistic children.[12]

No case cited by plaintiffs stands for the proposition that the DAS Card is <u>per se</u> impermissible simply because it is a uniformly-applied disability program.

---

[12]Plaintiffs' request for a standardized pass is consistent with other blanket policies—such as wheelchair ramps and video captioning devices—that offer a single, complete accommodation for everyone regardless of how mild or severe the disability.

44

Whether a guest's disability is mild or severe does not make the DAS Card illegal under the ADA. See Ault v. Walt Disney World Co., 692 F.3d 1212, 1216 (11th Cir. 2012) (upholding a class action settlement between mobility-disabled plaintiffs and Disney that permits a ban on two-wheeled Segways as a safety risk and provides Disney will develop a four-wheeled, electric, stand-up vehicle for class members who are unable to use a mobility device that requires sitting).

It is also noteworthy that Disney's Guest Relations staff interact with parents of individual disabled guests when they arrive to obtain a DAS Card and other services. Guest Relations staff discuss additional accommodations, such as Re-ad Passes, with parents who wish to discuss their autistic child's unique needs and are concerned the DAS Card will not meet those needs. While not every plaintiff received Re-ad Passes, that issue goes to whether the ADA requires more accommodations than Disney currently provides and does not diminish the fact that Guest Relations staff will discuss an individual's needs and consider whether to provide additional accommodations.

At bottom, Disney's issuing a DAS Card to all cognitively disabled guests is not per se impermissible under Title III of the ADA. We now examine plaintiffs' primary discrimination claims.

45

**D.    Claims Based on § 12182(b)(2)(A)(ii)**

As the district court correctly concluded, plaintiffs' discrimination claims are based on § 12182(b)(2)(A)(ii).  Because this Court has not previously addressed a claim under § 12182(b)(2)(A)(ii), we review § 12182(b) to place that subsection in context.

Section § 12182(b)(1) contains "General prohibitions" against discrimination, including the "denial of the opportunity" for a disabled person "to participate in or benefit" from services or facilities.  42 U.S.C. § 12182(b)(1)(A)(i).  Another "General prohibition" provides that it is discriminatory to afford a disabled person "the opportunity to participate in or benefit from" services or facilities "that is not equal to that afforded to other individuals."  Id. § 12182(b)(1)(A)(ii).

Along with these general principles, § 12182(b)(2) provides for "Specific prohibitions," which are examples of actions or omissions that constitute such discrimination.  One example is § 12182(b)(2)(A)(ii), which provides that discrimination includes a private entity's failure to make "reasonable modifications" to procedures that are "necessary" to afford the services and facilities of the private entity to the disabled, as follows:

> [Discrimination includes] a failure to make <u>reasonable modifications</u> in policies, practices, or procedures, when such modifications are <u>necessary</u> to afford such goods, services, facilities, privileges, advantages, or

46

> accommodations <u>to individuals with disabilities</u>, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]

42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).  The plaintiff bears the burden of proving not only that he is disabled but also that his requested modification is both "reasonable" and "necessary."  <u>Id.</u>; <u>see</u> <u>Gathright-Dietrich</u>, 452 F.3d at 1273–74 (discussing plaintiff's initial burden in a Title III case involving architectural barriers); <u>Johnson v. Gambrinus Co./Spoetzl Brewery</u>, 116 F.3d 1052, 1058 (5th Cir. 1997) (deriving burden in Title III reasonable modification case from Title I employment case).

No ADA violation occurs, however, when the private entity demonstrates that the requested modifications would "fundamentally alter the nature of" its services and facilities.  42 U.S.C. § 12182(b)(2)(A)(ii); <u>Martin</u>, 532 U.S. at 682, 121 S. Ct. at 1893 (quoting § 12182(b)(2)(A)(ii)).  The defendant private entity bears the burden of proof on the fundamental alteration inquiry.  <u>See</u> <u>Gathright-Dietrich</u>, 452 F.3d at 1273–75 (adopting the burden shifting framework for claims under § 12182(b)(2)(A)(iv), which requires reasonable modification unless the defendant shows it is not "readily achievable").

The Supreme Court has explained that the statutory text of § 12182(b)(2)(A)(ii) "contemplates three inquiries" for determining whether a

47

requested modification to a public accommodation's procedures is required. Martin, 532 U.S. at 683 n.38, 121 S. Ct. at 1893 n.38. The three inquiries are: (1) whether the requested modification is "reasonable"; (2) whether the requested modification is "necessary" for the disabled individual; and (3) whether the requested modification would "fundamentally alter the nature" of the public accommodation. Id. The Supreme Court instructed that "[w]hether one question should be decided before the others likely will vary from case to case, for in logic there seems to be no necessary priority among the three." Id. In some cases, "the specifics of the claimed disability might be examined within the context of what is a reasonable or necessary modification." Id.

Here, the district court ruled that the DAS program already provided plaintiffs with full and equal enjoyment of Disney's theme parks and that plaintiffs' requested additional modifications were not "necessary" under the ADA. The district court did not rule on the reasonableness or fundamental alteration inquiries. We therefore focus on the case law about "necessary" modifications and then analyze plaintiffs' impairments within that context.

## E.    Necessary Modifications

In PGA Tour, Inc. v. Martin, 532 U.S. 661, 682, 121 S. Ct. 1879, 1893 (2001), the Supreme Court touched briefly in dicta on the differences between reasonable and necessary in § 12182(b)(2)(A)(ii), although the Court ruled solely

48

on the "fundamental alteration" inquiry.  In Martin, the plaintiff, a mobility-disabled golfer, requested a waiver of the PGA Tour's walking rule and claimed that use of a golf cart was reasonable and necessary.[13]  Id. at 667–69, 121 S. Ct. at 1885–86.  After reviewing the extensive evidence at the bench trial and the district court's fact findings, the Supreme Court explained why allowing the plaintiff "to use a golf cart would not fundamentally alter the nature of [the PGA's] tournaments."  Id. at 681, 683–86, 690, 121 S. Ct. at 1893–95, 1897.  The PGA Tour did not dispute using a golf cart was reasonable and necessary for the plaintiff in Martin.  Id. at 682, 121 S. Ct. at 1893.

Nevertheless, how the Supreme Court distinguished these terms is informative.  The Supreme Court noted that use of a golf cart was a "reasonable modification" that was "necessary" if the plaintiff was to play in the PGA's tournaments.  Id. at 682, 121 S. Ct. at 1893.  The Supreme Court explained that "Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity."  Id.  The Supreme Court instructed: "In such cases, an accommodation might be reasonable but not necessary."  Id.

---

[13]The plaintiff in Martin could not walk the entire 18-hole course or compete without a golf cart.  Id. at 668–70, 121 S. Ct. at 1885–86.  Even with a cart, the plaintiff had to get in and out of the cart, walk over a mile during an 18-hole round, and suffered fatigue "undeniably greater" than that endured by able-bodied competitors from walking even that limited amount.  Id. at 671–72, 121 S. Ct. at 1887.  It was undisputed that the plaintiff was disabled and that the cart did not put him at a competitive advantage.  Id. at 670–74, 121 S. Ct. at 1886–87.

Because an accommodation may be reasonable, but still not necessary, it is easy to see why the district court in this case concentrated on whether plaintiffs' requested modification was necessary. Yet hard questions are presented by the legal contours and factual complexity of what is "necessary" for these severely disabled plaintiffs.

As to the legal standard, two circuit courts after <u>Martin</u> have addressed how to define "necessary" in § 12182(b)(2)(A)(ii). <u>See</u> <u>Argenyi v. Creighton Univ.</u>, 703 F.3d 441 (8th Cir. 2013) (applying §§ 12182(b)(2)(A)(ii)–(iii)); <u>Baughman v. Walt Disney World Co.</u>, 685 F.3d 1131 (9th Cir. 2012) (applying § 12182(b)(2)(A)(ii)). Both decisions used "a like experience" standard in evaluating whether the plaintiff's requested modification was "necessary" to provide an equal benefit and full and equal enjoyment. <u>Argenyi</u>, 703 F.3d at 448–51; <u>Baughman</u>, 685 F.3d at 1134–35.

The Ninth Circuit in <u>Baughman</u> explained that "[p]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then take reasonable steps to provide disabled guests with a like experience." 685 F.3d at 1135. Public accommodations have "to provide disabled patrons an experience comparable to that of able-bodied patrons." <u>Id.</u> "Facilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons," but rather "need only make accommodations that

50

are reasonable." Id.  Facilities must "help disabled guests have an experience more akin to that of nondisabled guests."[14]  Id.

Subsequently, the Eighth Circuit in Argenyi agreed with the Ninth Circuit's Baughman decision that to comply with Title III, public accommodations should (1) "start by considering how their facilities are used by nondisabled guests," and (2) "then take reasonable steps to provide disabled guests with a like experience." Argenyi, 703 F.3d at 449 (quoting Baughman, 685 F.3d at 1135).  In Argenyi, a hearing-impaired medical student sued under both Title III and the Rehabilitation Act, requesting certain auxiliary aids and services.  Id. at 443.  The district court granted summary judgment for the defendant university, concluding that the plaintiff "had not shown the accommodations he requested were 'necessary' within the meaning of the statutes" and that the university had provided "effective communication" as required by both laws.  Id. at 445–46.

Because it had "never determined the definition of 'necessary' under Title III," the Eighth Circuit consulted and applied the standard under the Rehabilitation Act.  Id. at 447–48.  Ultimately, the Eighth Circuit held that Title III, like Section 504 of the Rehabilitation Act, requires a public accommodation to

---

[14]Baughman involved a plaintiff who suffered from muscular dystrophy and wished to use a Segway at Disneyland.  685 F.3d at 1132.  Although reversing the district court's grant of summary judgment for Disney, the Ninth Circuit stressed that "[w]e do not hold that Disney must permit Segways at its theme parks" and that Disney "might be able to exclude them if it can prove that Segways can't be operated safely in its parks."  Id. at 1137.  But any safety regulation Disney imposes "must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  Id. (quoting 28 C.F.R. § 36.301(b)).

provide a disabled individual with "meaningful access or an equal opportunity to gain the same benefit as his nondisabled peers." Id. at 449. The Eighth Circuit pointed out that under a "meaningful access" standard, an entity's "aids and services 'are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons,' but they nevertheless 'must afford handicapped persons equal opportunity to . . . gain the same benefit.'" Id. at 449 (alteration in original) (quoting Loye v. Cty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010)). The Eighth Circuit concluded that the plaintiff's evidence created a genuine issue of fact as to whether the defendant university had denied the plaintiff "an equal opportunity to gain the same benefit from medical school as his nondisabled peers by refusing to provide his requested accommodations." Id. at 451.

In doing so, the Eighth Circuit in Argenyi observed that our Circuit "has similarly concluded that the 'proper inquiry' under the Rehabilitation Act to determine if a hospital had provided 'necessary' auxiliary aids to a hearing impaired patient was whether the proffered aids 'gave that patient an equal opportunity to benefit from the hospital's treatment.'" Id. at 449 (quoting Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 343 (11th Cir. 2012)). Indeed, in Liese this Court observed that the task of determining what is "necessary" under the Rehabilitation Act is "inherently fact-intensive" and "largely depends on

52

context." <u>Liese</u>, 701 F.3d at 342–43; <u>see</u> <u>Argenyi</u>, 703 F.3d at 449 (quoting <u>Liese</u>, 701 F.3d at 342–43).

Although <u>Liese</u> was a Rehabilitation Act case, this Court recently followed <u>Liese</u> in a lawsuit brought under both the ADA and the Rehabilitation Act. <u>See</u> <u>Silva v. Baptist Health S. Fla., Inc.</u>, 856 F.3d 824, 834 (11th Cir. 2017) (citing §§ 12182(b)(1)(A)(i)-(ii), (b)(2)(A)(iii)). We observed in <u>Silva</u> that the ADA and the Rehabilitation Act both focus on equal opportunity to participate in or benefit from the defendant's goods and services. <u>Id.</u> Reversing the district court's grant of summary judgment for the defendant, this Court concluded that whether the requested auxiliary aids for a hearing-impaired plaintiff were necessary was an "inherently fact-intensive" inquiry. <u>Id.</u> at 836 (quoting <u>Liese</u>, 701 F.3d at 342); <u>see also</u> <u>Crane v. Lifemark Hosp., Inc.</u>, ___ F.3d ___, ___, No. 16-17061, 2018 WL 3654427, at *3 (11th Cir. Aug. 3, 2018) (quoting <u>Silva</u>, 856 F.3d at 835–36) (noting that the "standard inquiry" of necessity is the same under the ADA and Rehabilitation Act).

The <u>Silva</u> Court added that "[n]onetheless, this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability." <u>Silva</u>, 856 F.3d at 836 (quoting <u>Liese</u>, 701 F.3d at 343). With that in mind, this Court proceeded "to evaluate the record evidence pertaining to whether there are disputed issues of material fact regarding Plaintiffs' claimed

53

impairments in their ability to exchange medically relevant information with Defendants' hospital staff." Id. Reversing the grant of summary judgment, we concluded that plaintiffs presented sufficient evidence to create a fact issue on whether they were denied the auxiliary aids "necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff," with a "level of communication . . . that is substantially equal to that afforded to non-disabled patients." Id. at 831, 835.

With this background, we examine the district court's summary-judgment conclusion that, as a matter of law, plaintiffs did not show that modifications beyond the DAS Card were "necessary" under § 12182(b)(2)(A)(ii).

## F.    Analysis of "Necessary"

We first agree with our sister circuits that public accommodations must start by considering how their facilities are used by nondisabled guests and then must take reasonable steps to provide disabled guests with a "like experience." Argenyi, 703 F.3d at 449; Baughman, 685 F.3d at 1135. In its analysis of necessary modifications, the district court correctly considered two factors: (1) how nondisabled guests use Disney's facilities; and (2) whether its DAS Card provides disabled guests with a like experience and equal enjoyment.

As to the first factor, we have described above in great detail how nondisabled guests access and use rides in Disney's parks. We conclude there is

54

no material fact issue as to that process or part of the district court's analysis. All nondisabled guests must plan ahead in order to reserve FastPass+ times and can obtain only three FastPass+ reservations in advance. Nondisabled guests without a DAS Card will inevitably have to wait to experience other rides at Disney's parks. For the most popular rides, nondisabled guests often must endure wait times of over an hour and must stand all together in a physical line.

As to the second factor, we must evaluate if the DAS program afforded the severely disabled plaintiffs a like experience and equal enjoyment. "Meaningful access" gives plaintiffs the opportunity to have something akin to or similar to the experience other people enjoy at Disney's park. See Argenyi, 703 F.3d at 449. Because nondisabled guests must plan as well, Disney's asking parents of disabled guests to do so is reasonable and not illegal. Further, facilities are not required to make the preferred accommodation of plaintiffs' choice. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285–86 (11th Cir. 1997). Facilities need make only reasonable accommodations that are "necessary." 42 U.S.C. § 12182(b)(2)(A)(ii). It is not enough to show that the DAS Card does not eliminate all discomfort or difficulty.

Here, as shown above, disabled guests can obtain not only three advance FastPass+ reservations but also a DAS Card "return time" for a fourth ride at Guest Relations at the beginning of the day. Then, after each subsequent DAS Card ride,

55

disabled guests can obtain one more DAS Card "return time" for a popular ride, all without waiting in a physical line.  The district court aptly observed that, compared to nondisabled guests, disabled guests with a DAS Card can "access those same rides in a fraction of the time" and without standing in line, which results in a "similar, or better, experience as those not needing accommodation."  So far, so good in the district court's ruling.

Although the DAS Card is a significant benefit, we conclude that factual disputes still exist about behavioral features of plaintiffs' impairments that make it more difficult to evaluate whether the DAS program provides a like experience. Plaintiffs' evidence posits that waiting for rides in the over-stimulated environment of a theme park, even virtually with the DAS Card, is beyond the capacity of plaintiffs given the specific and severe nature of their disabilities.  Plaintiffs' expert and lay evidence indicates that specific neurologically-based manifestations of plaintiffs' disabilities are: (1) that they have no concept of time, cannot defer gratification, and cannot wait for rides; and (2) that they must adhere to routine, visit the same ride repeatedly, and visit rides in the same order as in prior park visits.  Plaintiffs' evidence indicates that prompt and pre-set access to rides is "necessary" to prevent meltdowns and afford them an equal experience at and enjoyment of Disney's parks.  Plaintiffs explain that the DAS Card addresses only where they must wait, not that they must wait.

56

Each parent filed a declaration detailing his or her child's disabilities and special needs, including the inability to endure temporal waits and disruptions of routine. According to plaintiffs' evidence, their children with severe autism cannot comprehend the concept of time, which is the fundamental aspect of understanding that waiting in the present will produce something positive in the future. The claimed disability is waiting at all. Disney's DAS program accommodates the need to avoid physical lines, but not the need to avoid waits. It addresses the geographic burden but not the temporal one. Plaintiffs still must wait.

We recognize the district court relied on the fact that plaintiffs have waited in cars or airplanes for many hours until they get to their travel destinations. Disney's evidence does show that all plaintiffs have taken trips by car or plane to reach theme parks, cruise ships, or other destinations, and that their parents have managed their autistic children waiting in a car or plane during significant travel time. Disney submits the gratification from these trips—reaching the desired destination—was delayed significantly and not instant. Disney argues that living in society requires waiting in cars, on planes, and in a myriad of other places, such as schools, medical offices, and restaurants. That view is supported by Disney's evidence.

Nonetheless, plaintiffs presented conflicting evidence as to this behavioral aspect of their disabilities. The testimony of plaintiffs' parents is that all

57

environments are not identical, and managing a severely autistic child inside a car is materially different than in a chaotic theme park. According to plaintiffs' evidence, tolerance for travel by car or plane is not equivalent to tolerance for wait time in an amusement park. While plaintiffs' abilities to wait in a car or plane is relevant evidence, it is not dispositive as to whether, once inside a theme park with strong stimuli of all kinds, plaintiffs can wait virtually for their pre-set, routine rides. The DAS Card does allow disabled guests to avoid the crowded and constrained conditions that exist when standing in line for a ride. But Disney theme parks are high-commotion environments and plaintiffs must virtually wait therein.

In response, Disney's experts submit that, while plaintiffs wait virtually for a popular ride and their guaranteed "return time," they (even without comprehending any concept of time) are not idle and can enjoy other rides, parades, concerts, characters, restaurants, stores, and attractions, all of which have no wait. The record, however, creates factual issues about whether plaintiffs are able to transition to other activities without meltdowns or other behavioral challenges when they cannot access rides in their already-fixed routine orders or cannot access the same ride repeatedly.

In the light most favorable to plaintiffs, we conclude that genuine issues of material fact exist about these two aspects of plaintiffs' disabilities that preclude

58

summary judgment on the necessary-modification inquiry.  To determine what is "necessary" requires multiple fact findings regarding these two disputed behavioral characteristics of plaintiffs' disabilities.  Until those fact findings are made in a bench trial, it cannot be determined what is or is not necessary under the ADA.  The DAS Card, as good as it may be, still fails to address plaintiffs' alleged impairments of the inability to wait virtually for rides and the need to adhere to a routine order of rides or repeat rides.  Because factual disputes exist as to those impairments, we must reverse the grant of summary judgment in favor of Disney on the necessary-modification inquiry.

**G.    Reasonableness and Fundamental Alteration**

We recognize that Disney requests that we affirm on the alternative grounds that plaintiffs' requested modification—unlimited near-immediate access to all rides—is not reasonable and would fundamentally alter the park experience.  Plaintiffs point out that the district court did not address those issues and should do so first.  Undisputedly, this Court has the power to affirm a grant of summary judgment on any basis supported by the record.  Kolodziej v. Mason, 774 F.3d 736, 740 (11th Cir. 2014).

Those two alternative grounds, however, involve complicated issues too.  Here is but one of the parties' debates about the reasonableness and fundamental alteration inquiries that Disney asks us to resolve for the first time on appeal.

The parties contest the effect of plaintiffs' requested relief, which has evolved to this "single fix": an injunction requiring that Disney guarantee plaintiffs a maximum wait of 10 to 15 minutes for all rides. More specifically, plaintiffs ask this Court to implement this fix by ordering Disney to provide either: (1) a card offering automatic access to the FastPass lines for all rides at all times; or (2) between 6 and 10 guaranteed Re-ad Passes for the disabled guest and each person in the group. At oral argument, plaintiffs' counsel expressed a preference for unlimited access to the FastPass lines "for everyone's administrative burden" and because any number of Re-ad Passes would necessarily be limited.

In response, Disney argues that even if more than the DAS program is necessary, plaintiffs' proposed fix is unreasonable because it is the functional equivalent of Disney's previous system, which Disney avers was discontinued due to fraud and abuse. Prior to starting the DAS program in 2013, Disney offered a Guest Assistance Card (the "GAC"), which allowed disabled guests access to the FastPass line at every ride. Using a GAC, a disabled guest (and his group) could ride all rides whenever and as many times as he wanted, in any order, with very little waiting. As to the alleged abuse, Disney presented evidence that nondisabled guests would hire a "guide" who possessed a GAC, who then joined the guests' group and gave them the GAC benefit of FastPass access at all attractions. One Disney study showed that in 2013, approximately 3% of guests at Disney World

60

were issued GACs, but GAC-holding guests accounted for 30% of riders on one popular ride. According to Disney, this fundamentally altered the park experience because GAC-holding guests rode a popular ride three or four times, while many nondisabled guests experienced a two-hour line or were not able to get on the ride at all.

Plaintiffs vigorously dispute Disney's abuse claims. In the district court, plaintiffs even moved to exclude Disney's study showing that GAC-holding guests accounted for 30% of riders on one ride. Plaintiffs argued that Disney designed and skewed the study to "create a hypothetical perfect storm" by showing the effect of GAC usage on only the busiest ride and on only the busiest day. The district court did not rule on that motion. In any event, plaintiffs argue they are not asking for a return to the GAC system. Plaintiffs say their request is for a modification of the DAS program, not its destruction.

This is but one example of knotty issues that must be sorted out before a court could decide whether plaintiffs' requested accommodation, if proven necessary, is reasonable, and if so, whether it would fundamentally alter the park experience. We thus conclude that the reasonable and fundamental alteration inquiries must be addressed by the district court in the first instance, and we leave it to the district court how best to approach those issues on remand and whether further record development is needed. Among other things, the district court will

need to determine whether material issues of fact, if any, exist as to these two inquiries. Nothing herein expresses an opinion on that question.

## H.    Intentional Discrimination Cause of Action

We now turn to the district court's ruling that Count 1 of plaintiffs' complaints asserted only a cause of action for failure to make reasonable and necessary modifications under the ADA and did not contain a separate cause of action for intentional or disparate-impact discrimination under the ADA.

The factual allegations in each of the 30 complaints started out with 60-plus similar paragraphs of "Facts Common to All Claims" about Disney's theme parks and its DAS Card. Each complaint then had separate counts which set forth the causes of action. Every plaintiff asserted a single ADA claim as Count 1, which charged that Disney violated "42 U.S.C. §§ 12131, et seq." None of the other counts cited or involved the ADA, but rather asserted claims under state law.

Further, in every complaint, the ADA claim in Count 1 incorporated by reference all of the "Facts Common to All Claims" and added additional factual allegations about each plaintiff's individual experience with the DAS Card and the alleged failure of the DAS Card to address that particular plaintiff's autism and/or cognitive disabilities. As relief, the ADA claim in each Count 1 requested that the district court enter an injunction prohibiting Disney from further discrimination and requiring Disney "to reasonably modify its policies, practices, and procedures

62

to afford Plaintiff with an opportunity to experience Disney's goods, services, facilities, privileges, advantages, and accommodations."

We agree with the district court that plaintiffs' complaints contained a cause of action for failure to make reasonable and necessary modifications under the ADA but not a cause of action for intentional or disparate-impact discrimination. On appeal, plaintiffs' briefs primarily argue that the district court erred in its alternative ruling by reaching the merits and holding that even if plaintiffs properly had raised intentional or disparate-impact discrimination claims in their complaints, they did not make out a prima facie case. Plaintiffs challenge the district court's merits ruling that (1) plaintiffs' evidence did not show that a motivating factor behind the DAS Card was to impose an adverse effect on severely autistic individuals (the alleged element of an intentional discrimination claim), and (2) the DAS Card applied specifically to guests with cognitive disabilities, and was not a facially neutral policy (the alleged element of a disparate-impact claim). Given that plaintiffs' complaints do not contain a cause of action for intentional or disparate-impact discrimination under the ADA, we need not, and do not, reach the issue of whether plaintiffs' evidence was sufficient to survive summary judgment.[15]

_____

[15]Disney also argues that Title III of the ADA provides only a statutory discrimination claim for failure to make reasonable and necessary modifications, not a statutory claim for

63

Even if their complaints state no cause of action for intentional or disparate-impact discrimination, plaintiffs stress they still wish to introduce evidence at the bench trial relating to Disney's discriminatory intent when it enacted the DAS Card, in order to show that Disney never intended the DAS Card to be an adequate accommodation for guests with autism and/or cognitive disabilities. Plaintiffs also argue that their evidence of Disney's intent is relevant to and supports their state law claims alleging California Unruh Act violations and intentional torts. Of course, nothing in this opinion addresses, or prevents plaintiffs on remand from presenting, intent evidence at trial that is admissible under the Federal Rules of Evidence. That issue is premature because evidentiary matters at trial are for the district court to decide in the first instance.[16]

---

intentional or disparate-impact discrimination. Given that the complaints do not include intentional or disparate-impact discrimination claims, we also do not decide that legal issue.

[16]Many plaintiffs also asserted common law claims under Florida or California law, and nine plaintiffs brought claims under California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51–52. In a consolidated order entered in each case, the district court sua sponte dismissed plaintiffs' common law claims, reasoning that those claims were not sufficiently related to the ADA claims to justify the exercise of supplemental jurisdiction. Plaintiffs' briefs do not argue that this was error.

As to the nine plaintiffs with California Unruh Act claims, the district court concluded that Unruh Act liability is coextensive with ADA liability. Because summary judgment was granted on the ADA claims, the district court granted summary judgment on the Unruh Act claims. On appeal, plaintiffs argue that the district court erred as to their Unruh Act claims. Because we reverse as to the ADA claims, we reverse as to the Unruh Act claims and remand them for consideration by the district court in the first instance. We do not address the type of relief available under those Unruh Act claims.

## VIII.  CONCLUSION

For all of the above reasons, we (1) affirm the district court's entry of summary judgment for Disney as to plaintiffs' claims of intentional and disparate-impact discrimination under the ADA, (2) reverse the district court's ruling as to plaintiffs' standing, (3) vacate the district court's entry of summary judgment for Disney as to the necessary-modification inquiry under § 12182(b)(2)(A)(ii) of the ADA, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED IN PART.**