[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-12720

_____

A. L., by and through D.L.,
as Next Friend, Parent, and Natural Guardian,

Plaintiff-Appellant,

D.L.,
individually, et al.,

Plaintiffs,

*versus*

WALT DISNEY PARKS AND RESORTS U.S., INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:14-cv-01544-ACC-GJK

————————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
WATKINS,* District Judge.

LAGOA, Circuit Judge:

This case returns to us after we affirmed in part and reversed in part the district court's grant of summary judgment in favor of Walt Disney Parks and Resorts U.S., Inc., on A.L.'s—and other plaintiffs'—claims that Disney violated Title III of the Americans with Disabilities Act of 1990. *See A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.* (*A.L. I*), 900 F.3d 1270, 1296, 1300 (11th Cir. 2018). Given the thorough, exhaustive opinion written by the previous panel, we assume the readers' familiarity with the factual basis underlying this case. A.L.'s case is one of over forty actions filed by plaintiffs with disabilities against Disney in Florida and California federal courts, asserting that Disney failed to accommodate their requested modifications to its disability-accommodation program in violation of 42 U.S.C. § 12182(b)(2)(A)(ii).

_____

* Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

Following a bench trial after our remand, the district court entered final judgment in favor of Disney after determining that A.L.'s requested modification to receive either ten "Re-admission Passes" for each person in his party or unlimited access to Disney's expedited "FastPass" lines for its theme park attractions was neither necessary to accommodate A.L.'s disability nor reasonable under the Americans with Disabilities Act of 1990 (the "ADA"). The district court further determined that the requested modification would fundamentally alter Disney's business model. On appeal, A.L. contends that these determinations were clear error and that the district court applied the wrong legal test in its fundamental-alteration inquiry. A.L. also challenges various evidentiary rulings. After thoroughly reviewing the record and with the benefit of oral argument, we discern no clear error in the district court's factual findings, no legal error in its fundamental-alteration analysis, and no abuse of discretion in its evidentiary rulings. We thus affirm the district court's judgment.

## I.     FACTUAL AND PROCEDURAL HISTORY

### A.  A.L.

A.L. is an adult male diagnosed with autism. A.L. is in his late twenties, but his developmental age is "five-to-seven years old." A.L. is "extremely limited" in his ability to communicate with other people; he uses one-word utterances to respond to others and does not engage in full, two-way conversations. He cannot prepare his own meals, dress himself, nor care for his own hygiene. While A.L. cannot tell time based on a clock nor understand days of the

week, he has some concept of time, e.g., comprehending that "tomorrow" means some time in the future. Thus, A.L. is generally in the care of his mother, D.L., and they both reside in Orange County, Florida, with other family members.

Routine is critical for A.L. D.L. "manipulates the environment in order for [A.L.] to get to a point where he is a participating member of society." A.L. is extraordinarily regimented in his daily schedule. He eats the same foods for every meal, and if offered other food, he will refuse it. A.L. also eats at precisely the same time every day without exception. He is given thirty minutes of cell phone time between 9:30 p.m. and 10:00 p.m., and once the time runs out, he knows it is time to go to sleep. If his routines are disrupted, A.L. becomes anxious and gradually gets louder with audible noises, and if D.L. cannot deescalate A.L.'s anxiety such that he becomes overwhelmed, his behavior leads to "meltdowns," with A.L. becoming non-responsive. Additionally, A.L. has gone on many family vacations, including twenty-one cruises and car rides as long as seven hours (with breaks).

A.L. has received behavioral support services for his autism—designed to modify and reduce his "maladaptive behaviors"—since he was four years old. As part of the therapy with his support specialist, A.L. has worked on altering his need for extreme rigidity and routine, as well as learning to "tolerate waiting" for things. Through this therapy, he has learned enough patience to tolerate waiting up to fifteen to twenty minutes for things, which

is up from a former "target wait time" of thirty seconds back in 2008.

### B.  Disney's General Programs for All Visitors

Each day, tens of thousands of visitors experience Disney's world-famous theme parks.  *A.L. I*, 900 F.3d at 1274.  While guests at these parks can experience shows, parades, and concerts without waiting in line, in order to experience the rides and some other attractions at the parks, visitors will stand in lines—called Stand-By lines—for some attractions and wait until they are at the front of the line to enter the ride; sometimes, the wait times can extend for over an hour.  *Id.* at 1275.  Over time, Disney has tried to remedy this problem by creating different programs to reduce standby wait time—namely, the FastPass system and Re-admission ("Re-ad") Passes.  *See id.* at 1275–76.  The FastPass system is available to all guests.  *Id.* at 1275.  Most attractions have both the Stand-By line and the FastPass line.  As we explained in *A.L. I*:

> Disney's present version of FastPass is the FastPass+ system.  With FastPass+, a guest can make advance reservations for up to three rides for each day of his visit.  A guest might reserve one ride at 10:00 a.m., one at 1:30 p.m., and one at 4:00 p.m.  At each of those reserved times—or within an "arrival window" around the reserved time—the guest can go to the ride and board through the express FastPass line, which typically involves a wait of no more than 5 to 10 minutes.  This eliminates the need to stand physically in a line for those three rides.

FastPass+ reservations are available on a first-come, first-served basis. FastPass+ reservation times are part of each ride's capacity inventory. Once capacity is reached for the ride, no more FastPass+ reservations for that ride are granted for that day. All guests who have purchased an admission ticket to a theme park can make their FastPass+ selections up to 30 days in advance. If a guest is staying at a Disney Resort hotel, the guest can make his FastPass+ selections up to 60 days prior to check-in.

Id. at 1275–76.

On the other hand, Re-ad Passes are "instant access passes" that allow guests "to access immediately a ride by going to the short FastPass line." Id. at 1276. Re-ad Passes are essentially "an ameliorative tool" that Disney offers guests, whether disabled or not, who have had a negative or an unpleasant experience. Id. "A guest can use a Re-ad Pass at any time and for any ride, whereas a FastPass reservation is for a specific ride at a set time and must be used within an hour of that time." Id.

## C. Disney's Programs for Accommodating Visitors with Disabilities

Unlike the FastPass system, which is available to all visitors, the Guest Assistance Card ("GAC") system was Disney's primary accommodation for visitors with disabilities and their families. Id. at 1298. Until October 2013, the GAC system provided a disabled guest and his group with unlimited, repeated, and on-demand access to rides and attractions. Id.

Disney, however, determined that the GAC system proved unmanageable, fraught with widespread abuse and fraud. It became an unlimited front-of-the-line pass for anyone requesting it because Disney could not ask a visitor for proof of disability. In fact, the GAC system became a media sensation for all of the wrong reasons. For example, parents with the financial means would pay disabled tour guides to lead them through Disney parks so they could skip long lines. According to a study of five of the most popular attractions conducted by Disney's Industrial Engineering team, the GAC system usage was "much higher" than the number of GAC passes issued. The study concluded that the GAC system was unintentionally providing a small minority of visitors multiple opportunities to experience a given ride while denying non-GAC visitors the chance to experience a given ride even once. This study prompted Disney to consider and implement changes to the GAC system.

In October 2013, Disney replaced the GAC system with the Disability Access Service ("DAS") program. *Id.* at 1276. The DAS program does not require guests physically to stand in line. *Id.* at 1277. DAS cardholders can wait in a specific attraction's line "virtually" while being elsewhere in the park. DAS cardholders are given a "return time," and upon returning at their "return time," DAS visitors enter the FastPass line, which typically involves a wait of no more than five to ten minutes. *Id.* at 1275–77. They can use DAS to go on rides with shorter wait times while they wait virtually for the return time on a ride with a longer wait time. *Id.* at

1277.  Moreover, with a DAS card, DAS visitors' return time appointments are good until the end of day, meaning that the guest may return to ride the attraction at any point following the scheduled return time.  *Id.*  And if the total wait time posted at the attraction is fifteen minutes or less, DAS visitors are typically given access immediately.  *Id.* at 1278.  A DAS visitor may hold only one return time at any given time.

In addition to DAS, Disney offers a variety of other individualized services to assist guests with cognitive disabilities including autism, such as itinerary planning to maximize their experience and minimize waiting and a planning guide that provides specific strategies to use when visiting the park.  According to Disney's expert witness, an expert in autism and pediatric neuropsychology, these strategies for DAS families mirror the strategies that clinicians use to treat individuals with autism.

### D.  A.L.'s December 2013 Visit to Magic Kingdom

A.L., D.L., a behavioral specialist for A.L., and several other family members and friends visited Disney's Magic Kingdom on December 19, 2013.  *Id.* at 1283.  This was A.L.'s first visit to the park since the DAS system was introduced.  Upon entering the park, they visited Guest Relations, where they received a DAS Card and twenty-four total Re-ad Passes (four per person in the group). *Id.*

A.L. has a list of nineteen attractions he prefers to ride or experience at the Magic Kingdom, although he does not always

choose to go to every attraction on the list.  During this visit, A.L.'s first ride of choice was Jungle Cruise (the second attraction on his list), which, after using the DAS Card, had a "return time" of forty-five minutes.  *Id.*  The family agreed that this was too long of a wait for A.L., so they each used one of their respective Re-ad Passes to board the ride immediately.  *Id.*  Then, A.L.'s "family determined that with only three Re-ad Passes remaining per person, it would not be possible to visit all of A.L.'s regular rides in order without some waiting, and that they would need to leave the park."  *Id.* at 1283–84.  As a result of this decision, the family skipped the other seventeen attractions on A.L.'s list.

### E.  *A.L. I*

The DAS program has proven to be unpopular among some of Disney's fans with disabilities.  In early 2014, plaintiffs began filing lawsuits—forty-four in total—challenging the DAS program on the basis that it violated Title III of the ADA, *see* 42 U.S.C. § 12182(b)(2)(A)(ii), because it did not allow visitors with disabilities to go on rides without waiting and in the order they wanted, *A.L. I*, 900 F.3d at 1288.  The plaintiffs filed their cases in either the Central District of California or the Middle District of Florida; the cases filed in California eventually were transferred to the Middle District of Florida.  *Id.*  A.L.'s case was the first of these cases to be filed.  *Id.*  A.L. sought a permanent injunction requiring that he be permitted unlimited access to Disney's attractions via the FastPass lines or similar relief through at least ten Re-ad Passes.  He also

brought a claim for breach of contract and other garden-variety common-law claims.[1]

Following discovery, the parties cross-moved for summary judgment, and the district court granted Disney summary judgment and entered judgment in its favor. The district court found A.L. (and the other plaintiffs) could not make the required showing that his requested modifications were "necessary" to afford him "equal access" to the benefits of Disney's attractions because:

> (1) Disney provided plaintiffs an opportunity to gain a like benefit from its parks that is enjoyed by non-disabled individuals; (2) plaintiffs can all wait in a car or a plane to get to Disney's parks, and therefore plaintiffs can wait virtually with a DAS Card to access rides at scheduled times; and (3) DAS is an existing means to equal access. In those cases where the issue was contested, the district court also concluded that plaintiffs "can deviate from [their] preordained route[s]."

*Id.* at 1288–89 (alterations in original). A.L. appealed. *Id.* at 1289. Soon after, the district court entered substantially the same order in the thirty-seven related cases pending before it. *Id.* at 1288–89. Twenty-nine of those plaintiffs appealed, and this Court consolidated them with A.L.'s appeal. *Id.* at 1289.

---

[1] The district court dismissed these claims, and A.L. did not appeal those dismissals.

A panel of this Court affirmed in part and reversed in part, holding that although the DAS Card was "a significant benefit" for Disney's visitors with disabilities, there existed genuine disputes of material fact on whether certain "behavioral features" of autism made A.L.'s requested modification "necessary" to prevent meltdowns and thus to afford him an "equal experience" at Disney's parks. *Id.* at 1296–97, 1300.

### F.  Relevant Procedural Issues After Remand

On remand, the district court issued an order reopening the case,[2] including reopening several substantive *Daubert* motions and motions in limine that had been closed before the appeal in *A.L. I.* The district court then set the case for trial on February 18, 2020.

In November 2019, the district court ruled on the motions in limine. The district court granted Disney's motion to bar A.L. from presenting evidence such as internal communications to argue "generally" that Disney intentionally discriminated against autistic individuals and their families because Disney purportedly knew that DAS would not accommodate persons like A.L. The district court reasoned that this evidence would not relate to A.L.'s individualized experiences. The district court also ordered the parties to file an amended joint pretrial statement and witness and

---

[2] In doing so, the district court denied A.L.'s motion to stay the action pending the trial of similar actions in another district.

exhibit lists consistent with its rulings but did not grant leave for the parties to add additional witnesses or exhibits. The parties did so two weeks later.

A.L., however, expanded his exhibit and witness lists to include allegedly "new" information and three witnesses who had become known or involved in the case during the prior three years—an expert witness, Dr. Lila Kimel, as well as two Disney employees. The district court struck A.L.'s filings, noting that A.L. had also failed to delete exhibits it had ruled would be excluded or reduce the number of listed witnesses, and ordered his counsel to show cause why he should not be sanctioned for filing them. In a response, A.L.'s counsel explained that he had no reason to believe the district court would have "expedited" trial on remand and set the matter for trial before the pending California trials of similar cases. Counsel also argued that he was unaware of any order or rule barring the addition of new witnesses and exhibits after a remand from this Court and that "logic would not support or infer that the addition of new witnesses should be implicitly barred." Counsel also stated that, in not removing the exhibits, he merely intended to create "the best possible record of the case." The district court never ruled on the show-cause issue.

On February 6, 2020—twelve days before trial—A.L. noticed Dr. Ananthi Rathinam, a neurologist, for deposition. The purpose of the deposition was to memorialize the doctor's trial testimony, as A.L. had learned that Dr. Rathinam was unavailable to attend trial. A.L. noticed the deposition for February 12, 2020—

just six days before the commencement of trial.  Disney moved to strike the deposition notice, and the magistrate judge granted Disney's motion.  A.L. did not serve and file an objection to the magistrate judge's order.

Less than nineteen hours before trial, A.L.'s counsel notified Disney that Dr. Rathinam would be "out of state" for the rest of the week and that counsel was considering "ask[ing] Judge Conway for leave to re-schedule [Dr. Rathinam] for an evening telephone deposition during trial, probably tomorrow night."  At the same time, A.L.'s counsel notified Disney that he intended not to call his expert witness Dr. Joette James at trial and would instead introduce deposition designations that had not previously been provided.  Disney moved to prohibit A.L. from taking Dr. Rathinam's deposition on the first night of trial and to prohibit A.L. for introducing at trial deposition designations of Dr. James.  The district court granted Disney's motion.

### G.  Bench Trial and the District Court's Judgment

The case proceeded to a bench trial on February 18, 2020.  Following a three-day trial, the district court entered an exhaustive memorandum decision and order.  The district court found that A.L.'s requested modification of unlimited access to Disney's theme park attractions—via Disney's expedited FastPass lines or through at least ten readmission passes for each person in his party—was neither necessary nor a reasonable accommodation.  As to whether the proposed modification was necessary, the district court found that access for A.L. using the DAS Card and

FastPass, without further modification, was a "like experience" to that of non-disabled guests. Reviewing the evidence, the district court found that A.L. had "some concept of time, can defer gratification, and can wait 'virtually' for a ride because he can be successfully redirected to another activity while waiting for the ride return time on the DAS card." The district court explained that, because the DAS system allowed "disabled guests to access the most popular attractions in the park with less wait time than the standby line, those guests can see more attractions than a non-DAS guest could experience because some of the wait time throughout the day has been eliminated." The district court noted that Disney's evidence at trial showed A.L. could have visited all nineteen attractions on his list during the December 19 visit with the passes provided to A.L.'s party—"a significantly higher number of rides than a typical nondisabled guest experiences in a day." And the district court noted that D.L. had not done any preplanning to prepare A.L. for the change from the GAC system to the DAS Card. Thus, the district court found that the DAS card provided A.L. with a "'like,' if not better, experience and equal enjoyment than nondisabled guests experience."

As to reasonableness, the district court explained the accommodation would "lengthen the wait times for all other riders, severely impacting the remaining non-DAS users," and "potentially lead to the same fraud and overuse that existed with the GAC system, which required a complete overhaul." The district court also noted that "[t]he word spreading on social media that one disabled

individual received an accommodation of ten readmission passes will increase the demand to be treated similarly by every disabled individual once they find out, as well as those willing to misrepresent they are disabled," leading to the same issues plaguing the GAC system. (Emphasis omitted). But even if the requested modification were necessary and reasonable, the district court determined that Disney was not required to accommodate A.L. with the request because, based on Disney's uncontroverted industrial engineering studies and its expert's opinion, it would fundamentally alter Disney's services to its other visitors, e.g., by increasing wait times for most other guests without DAS, which in turn would dramatically reduce guest satisfaction levels.

The district court thus entered judgment for Disney, and A.L. timely filed this appeal.

## II.    STANDARDS OF REVIEW

In an appeal from a bench trial, we review the district court's conclusions of law de novo and its factual findings for clear error. *Tartell v. S. Fla. Sinus and Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015). "Clear error is a highly deferential standard of review." *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019) (quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005)). Findings of fact are clearly erroneous when, after viewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 1197 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "In applying the clearly erroneous standard to the findings of a

district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Anderson*, 470 U.S. at 573 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969)).

"We review evidentiary rulings only for an abuse of discretion." *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1122 (11th Cir. 2020). "A district court abuses its discretion if it 'applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous.'" *Id.* (quoting *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014)). "We will not overturn an evidentiary ruling unless the moving party proves a substantial prejudicial effect." *Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997)

## III.    ANALYSIS

On appeal, A.L. makes several arguments. His first two arguments concern legal and sufficiency-of-the-evidence challenges to the district court's verdict for Disney. First, he argues that the district court erred in finding his requested modifications would "fundamentally alter" Disney's business model. Second, he contends that the district court erred in finding the modifications were neither necessary nor reasonable. A.L.'s final argument challenges several of the district court's evidentiary and discretionary rulings. We first discuss the general law as it pertains to Title III of the ADA before turning to A.L.'s arguments.

## A.  Title III of the ADA

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals," *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001), by providing "clear, strong, consistent, enforceable standards" addressing that discrimination, 42 U.S.C. § 12101(b)(2).  Title III of the ADA prohibits any "place of public accommodation" from discriminating against disabled individuals with regards to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations."  *Id.* § 12182(a); *see also id.* § 12181(7)(I) (defining places of "public accommodation" to include "a park, zoo, amusement park, or other place of recreation").  Title III defines "discrimination" as, among other things:

> a failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id.* § 12182(b)(2)(A)(ii) (emphasis added); *accord A.L. I*, 900 F.3d at 1292; *see also Martin*, 532 U.S. at 688 ("Title III of the [ADA] requires without exception that any 'policies, practices, or procedures' of a public accommodation be reasonably modified for disabled 'individuals' as necessary to afford access unless doing so would fundamentally alter what is offered." (quoting

§ 12182(b)(2)(A)(ii)).  And a "plaintiff bears the burden of proving not only that he is disabled but also that his requested modification is both 'reasonable' and 'necessary.'"  *A.L. I*, 900 F.3d at 1292 (quoting § 12182(b)(2)(A)(ii)).

Here, in entering judgment for Disney, the district court made two determinative findings.  First, the district court found A.L.'s requested modifications were neither "necessary" nor "reasonable" for him to realize the "full and equal enjoyment" of Disney's services.  Second, the district court found that A.L.'s requested modifications, if offered by Disney, would "fundamentally alter" Disney's business model.  A.L. contends that both findings constituted clear error.  We address each finding in turn.

## B.  Necessary and Reasonable

We first address the district court's finding that A.L. failed to prove the requisite elements of his Title III claim.  In assessing whether A.L.'s requested modification to the DAS program was necessary under Title III of the ADA, we held in *A.L. I* that Disney must afford A.L. "the opportunity to have something akin to or similar to the experience" of non-disabled guests but Disney "was not required to make the preferred accommodation of A.L.'s choice."  900 F.3d at 1296.  Because places of public accommodations must "provide disabled patrons an experience comparable to that of able-bodied patrons," whether an accommodation sought by a disabled person is "necessary" under § 12182(b)(2)(A)(ii) is determined by considering first "how [the business's] facilities are used by nondisabled guests."  *A.L. I*, 900 F.3d at 1294, 1296 (first

20-12720                Opinion of the Court                19

quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012)).  The analysis then turns to whether the business has taken "reasonable steps to provide disabled guests with a 'like experience.'" *Id.* at 1296 (quoting *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013)).  "[F]acilities are not required to make the preferred accommodation of plaintiffs' choice.  Facilities need make only reasonable accommodations that are 'necessary.'" *Id.* (citation omitted).  Indeed, "[i]t is not enough to show that the [accommodation] does not eliminate all discomfort or difficulty." *Id.*

In arguing that the district court correctly determined that A.L.'s requested modification was not "necessary" under the ADA, Disney cites *Galvan v. Walt Disney Parks & Resorts U.S., Inc.*, 425 F. Supp. 3d 1234 (C.D. Cal. 2019)—decided after our decision in *A.L. I*—where the district court rejected a substantially similar argument from a plaintiff with cerebral palsy who had knee surgery shortly before the visit to Disney during which he alleged he had been denied equal access. *Id.* at 1242.  In *Galvan*, the district court found that the plaintiff failed to show that "his request for priority ride access [was] necessary under the ADA because he had access to Disneyland comparable to able-bodied persons." *Id.* at 1243.  The *Galvan* plaintiff had "expressly stated that he experienced the same number of rides and spent the same amount of time at Disneyland" with and without a DAS pass, indicating that the pass was not necessary to provide him with park access. *Id.* (emphasis removed).  And there was no evidence that the plaintiff could not access the park without a DAS pass, where Disney had offered him

a wheelchair that he declined to use. *Id.* Even accounting for the obvious differences between cerebral palsy and autism, we agree with the reasoning behind the conclusion in *Galvan* that the plaintiff had not established an ADA violation.

Here, the district court found that A.L.'s requested modification was not necessary under the ADA. Reviewing the record, we conclude that the district court's thorough findings on the issue were not clearly erroneous, as they are supported by the record evidence. For example, the district court, in determining that the DAS card provided a like experience, found that "A.L. has some concept of time, can defer gratification, and can wait 'virtually' for a ride because he can be successfully redirected to another activity." This finding was buttressed by D.L. herself testifying that A.L. "can wait 15, 20 minutes in a line . . . and be successful" doing so. Further, there was evidence at trial that A.L. has gone on many family vacations, including twenty-one cruises, lasted up to seven hours in car rides, and sat through Broadway shows that were up to three hours in length. While these environments may differ from the stimulus of a theme park, as we recognized in *A.L. I*, the district court's finding that A.L. can wait and be redirected even in a theme park is supported by evidence in the record. 900 F.3d at 1297. The district court's other findings on the likeness of the experience are also supported by evidence in the record, i.e., with the DAS card, A.L. could have experienced all the rides on his list, which were a significantly higher number than typical nondisabled guests experience in a day at Magic Kingdom.

Next, we turn to reasonableness—whether A.L.'s requested modification was reasonable.  As an initial matter, Disney contends that A.L.'s initial brief is "devoid of any discussion" as to the district court's conclusion that his requested modification was not necessary to provide him an experience akin to or like that of a non-disabled guest.  We agree.  "When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680 (11th Cir. 2014)  Because A.L.'s brief contains no discussion of the district court's reasonableness finding, we conclude that A.L. has abandoned this issue on appeal.  That abandonment is sufficient on its own to affirm the district court's judgment in favor of Disney. Id.

But even if we consider the merits of whether A.L.'s requested modification was reasonable, we conclude that the district court correctly determined that A.L.'s requested modification was not reasonable.  As the district court explained, A.L.'s requested modification would "lengthen the wait times for all other riders, severely impacting the remaining non-DAS users, . . . and potentially lead to the same fraud and overuse that existed with the GAC system, which required a complete overhaul to the current more-controllable DAS system."  We determine that this finding is not clearly erroneous, as it is supported by record evidence.  Indeed, two Disney representatives testified about the issues plaguing the

GAC system. Disney "lost control over who got [GAC] passes" because "it became increasingly knowledgeable to everyone that you could go into guest relations and say that they needed the assistance and acquire that assistance." The system also led to "repetitive" and "excessive" use, i.e., "in an extreme way compared to how guests without the passes experienced the park." And people "were impersonating Disney tour guides" or children with terminal illnesses to take people on rides with fraudulently obtained passes or selling the passes online—i.e., "a wide spectrum of abuse." Further, as the district court noted, based on an empirical study of the GAC ridership, Disney's engineers concluded that the portion of the guest population holding GAC passes was consuming a substantial portion of ride capacity. Moreover, a Disney representative opined that a return to a pre-DAS system would be equally or even more unsustainable given popular new rides. And, as the district court explained, A.L.'s proposed modification would be like returning to the unlimited access to FastPast lines that occurred in the GAC system—a system that suffered from fraud and abuse.

Accordingly, we conclude that the district court's findings that A.L.'s requested modification was neither necessary nor reasonable to accommodate his disability were not clearly erroneous. We therefore affirm the district court's determination that A.L. failed to state a claim under Title III of the ADA.

### C. Fundamental Alteration

A.L. further argues that the district court's consideration of any potential "fundamental alteration" to Disney's business model constituted error because the district court both applied the wrong legal test and reached a conclusion unsupported by the evidence. Both arguments fail.

First, A.L. argues that the district court "distort[ed] the language of ADA" by evaluating whether Disney's "business" or "profitability" would be fundamentally altered. A.L. contends that this was the wrong legal analysis because the ADA asks whether the requested modifications would alter the "nature" of the goods and services and the defendant's business model is not properly part of that inquiry. He focuses on the ADA's use of the term "individual" and contends that "[r]ather than analyzing the impact of A.L.'s requested modification on Disney's services, the trial court analyze[d] the impact of an unknown and hypothetical number of disabled persons on Disney's business plan." He insists the focus must be solely on the needs of "the individual"—the visitor with disabilities—to the exclusion of all other considerations, including the business. We disagree.

As stated above, Title III of the ADA defines "discrimination," in relevant part, as:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can*

> *demonstrate that making such modifications would*
> *fundamentally alter the nature of such goods, ser-*
> *vices, facilities, privileges, advantages, or accommo-*
> *dations.*

§ 12182(b)(2)(A)(ii) (emphasis added). The statute does not further define a fundamental alteration to the nature of the entity's services, but *Martin* illustrates the proper analysis. 532 U.S. at 682–91. There, the Supreme Court, in considering whether allowing an amateur golfer to participate in the PGA Tour's golf tournament with a golf cart would fundamentally alter the tournament, emphasized the purpose of the walking rule from which Martin sought an exemption. *See id.* at 690. The Court explained that the purpose of the rule was to subject players to fatigue and that this purpose would not be subverted by allowing Martin to use a cart. The district court had found that Martin's condition subjected him to greater fatigue, even when using a cart, than his competitors experienced by walking. *Id.* The Court held that "[a] modification that provides an exception to a peripheral tournament rule without impairing its purpose cannot be said to 'fundamentally alter' the tournament." *Id.* at 690.

The district court here applied the correct legal test. It considered whether the requested modification would affect merely peripheral aspects of Disney's parks or aspects essential to Disney's services. The district court determined that the fundamental-inquiry analysis rested on fact questions, particularly whether and to what degree A.L.'s requested modification would impact wait

times for rides and to what extent wait times for rides are essential to Disney's services. The district court's analysis is analogous to the Supreme Court's approach in *Martin*, in which the Court evaluated the relationship of the rule to the nature of the services offered as well as the impact the requested modification would have on the purpose served by the rule. *See id.* at 690–91. Likewise, here, the district court considered the relevant rule and its purpose, determined that the rule was not peripheral, and determined that the requested accommodation would undermine the purpose of the rule. A.L.'s criticism of the district court's legal analysis amounts to nothing more than an objection to the use of the phrase "business model" when discussing the effects of the requested modification on Disney's services, but that is not a legal error.

A.L. also argues that the evidence did not support the district court's fundamental-alteration finding, but we discern no clear error. Disney, as the defendant, bore the burden of proof on the fundamental-alteration inquiry. *See* § 12182(b)(2)(A)(ii) (requiring that "the entity" show a fundamental alteration to its services); *see also A.L. I*, 900 F.3d at 1292. The district court found that Disney satisfied that burden by proving that the requested accommodation would have to be offered to many more guests other than A.L. and that the aggregate effect would fundamentally alter Disney's services. The district court determined that Disney had proved that modifications to the DAS card would have to be uniformly applied to all DAS guests. Next, the district court found that Disney's uncontroverted evidence proved that the modification in the

aggregate would increase wait time for the 96.7% of guests who do not have DAS cards and would essentially be a return to the abuse-ridden GAC system. Finally, the district court determined that the evidence proved that the modification would interfere with non-DAS guests' ability to access Disney's services—meaning that it was not merely peripheral—and would decrease their satisfaction. Therefore, the effect of the accommodation would be to "fundamentally alter" Disney's park operations and business.

## D. Evidentiary Rulings

Finally, A.L. challenges several of the district court's evidentiary rulings. A.L. contends the district court abused its discretion by: (1) excluding the testimony of a neurologist, Dr. Ananthi Rathinam; (2) excluding the testimony of A.L.'s expert on autism; (3) admitting Disney's expert report; and (4) excluding A.L. from presenting evidence that Disney's implementation of the DAS program was a form of intentional discrimination.

First, A.L. argues that the magistrate judge's refusal to allow him to depose Dr. Rathinam "left [him] with no expert witness, either live or by deposition." But A.L. never served and filed an objection to the magistrate judge's order. Federal Rule of Civil Procedure 72(a) provides that when a magistrate judge issues a written order on "a pretrial matter not dispositive of a party's claim or defense," the "party may serve and file objections to the order within 14 days after being served with a copy"; however, "a party *may not assign as error a defect in the order not timely objected to.*" (Emphasis added). Thus, a party's failure to file objections to a

magistrate judge's order in a non-dispositive matter to the district court waives that claim on appeal to the circuit court. Because A.L. filed no objection to the magistrate judge's order, we cannot review this issue. *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1286 (11th Cir. 2003) ("Because he failed to timely challenge the magistrate's non-dispositive orders before the district court, Maynard waived his right to appeal those matters here.").

A.L. also argues that the district court abused its discretion in denying his request to depose Dr. Rathinam after trial began. The decision whether to permit a deposition to be taken for use at trial is left to the sound discretion of the trial court, "consider[ing] all the circumstances, including fairness to the adverse party and the amount of time remaining before the date set for trial." *Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1362 (11th Cir. 2002); *cf. Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 553 (6th Cir. 2015) (affirming the denial of a trial deposition where "discovery had long since closed when [plaintiff] made this request—only one full business day before trial"). Here, the magistrate judge had already denied A.L.'s attempt to depose Dr. Rathinam and A.L. did not appeal that ruling, as discussed above. The district court found that A.L. failed to show "good cause" for not abiding by the magistrate judge's ruling.

A.L.'s only argument is, again, that the district court left him "with no expert witnesses." Considering all the circumstances— that discovery had long since been closed, that trial had

commenced, and that Disney would be prejudiced by the short notice to prepare for a full deposition while continuing its trial preparations—we conclude that the district court did not abuse its discretion in denying A.L.'s request to conduct a deposition of Dr. Rathinam after trial began.

A.L. further argues the district court abused its discretion in excluding his autism expert, Dr. Lila Kimel, and denying his request to have Dr. Kimel testify at trial, or, alternatively, to introduce the deposition testimony of Dr. Joette James. The district court denied these requests because A.L. was late in disclosing Dr. Kimel and disclosed that Dr. James's testimony would be presented by deposition, instead of at trial, less than twenty-four hours before the start of trial. We conclude that no abuse of discretion occurred here. Federal Rule of Civil Procedure 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Moreover, the Middle District of Florida's Local Rule 3.06 (2020)—in effect at the time of trial—provides that "[t]he pretrial statement and the pretrial order . . . control the course of the trial and may not be amended except by order of the Court in the furtherance of justice." Here, the case management and scheduling order required A.L. to disclose expert witnesses by June 10, 2015. A.L. failed to make the expert witness disclosure by the district court's deadline. Based on the record before us, the district court did not abuse its discretion in controlling its own docket in a case that was over seven years old and was starting trial in less than

twenty-four hours. *See Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1415–16 (11th Cir. 2011).

A.L. also argues the district court abused its discretion in overruling his hearsay objection to Disney's expert report and admitting it into evidence. A.L. did not challenge the expert witness's qualifications, and the witness was proffered as an expert without objection by A.L. "We will not overturn an evidentiary ruling unless the moving party proves a substantial prejudicial effect." *Goulah*, 118 F.3d at 1483. Here, there was no "substantial prejudicial effect" as to the admission of the expert report. In its order, the district court cited extensively to the expert's live trial testimony rather than the expert report itself. And A.L.'s only argument as to prejudice is that the "cumulative effect" of the district court's evidentiary rulings "was prejudicial in so far as the trial court expressly deemed Defendant's expert testimony to be unrebutted." But that does not explain how the admission of Disney's expert report in addition to Disney's expert's testimony prejudiced A.L. We therefore conclude that the district court did not abuse its discretion in overruling A.L.'s objection to Disney's expert report and admitting it into evidence.

Finally, A.L. contends that the district court erred in excluding him from presenting evidence at trial relating to Disney's implementation of the DAS program as a form of intentional discrimination, as he asserts that the evidence would have been used for other reasons. We disagree. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact

more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." As we previously explained in *A.L. I*, A.L.'s complaint does not contain "a cause of action for intentional or disparate-impact discrimination under the ADA." 900 F.3d at 1300. And we conclude that the other reasons A.L. offers for the presentation of this excluded evidence—that the DAS program is "dysfunctional" and was created to reduce the number of "ghost riders" and disabled "tour guides" in Disney parks (i.e., to curb abuse)—are similarly neither relevant nor probative of the individualized injunctive relief he seeks. And the district court, in its order on Disney's motion in limine, explained that "[t]o the extent A.L. intends to introduce evidence at trial of Disney's internal communications between Disney employees related directly to A.L.'s individual experience on December 19, 2013 or the 'necessity' of his proposed accommodation, such evidence would be relevant and admissible, subject to the Federal Rules of Evidence governing hearsay, authentication, etc." A.L. has not shown a "substantial prejudicial effect" from the exclusion of this evidence, *see Goulah*, 118 F.3d at 1483, and we thus conclude that the district court did not abuse its discretion.

## IV.   CONCLUSION

For all these reasons, we affirm the district court's judgment in favor of Disney.

**AFFIRMED.**